242 N.J. Super. 667 (1990)
577 A.2d 1316
IN THE MATTER OF ALLEGATIONS OF VIOLATIONS OF LAW AND ADMINISTRATIVE CODE BY FIORILLO BROS. OF N.J., INC., TRI-COMPACTION SALES, INC., AND JOSEPH FIORILLO, MICHAEL FIORILLO, ANTHONY FIORILLO, MATTHEW IANNIELLO AND BENJAMIN COHEN, INDIVIDUALLY AND AS OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AND/OR ADMINISTRATORS OF FIORILLO BROS. OF N.J., INC., RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1990.
Decided July 23, 1990.
*671 Before Judges MICHELS, DEIGHAN and R.S. COHEN.
Richard F. Aronsohn argued the cause for appellants (Aronsohn, Springstead & Weiner, attorneys; Richard F. Aronsohn, of counsel; Gerald R. Salerno, Ronald S. Bergamini, and Mark S. Paige, on the brief).
Susan J. Vercheak, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Susan J. Vercheak, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Appellants Fiorillo Bros. of N.J., Inc. (Fiorillo Bros.), Tri-Compaction Sales, Inc. (Tri-Compaction), and Joseph Fiorillo, Michael Fiorillo, Anthony Fiorillo, Matthew Ianniello and Benjamin Cohen, individually and as officers, directors, shareholders, employees, and/or administrators of Fiorillo Bros. of N.J., Inc. appeal from a final administrative action of respondent New Jersey Board of Public Utilities (Board) dated January 25, 1989, that, in part (1) revoked Fiorillo Bros.' certificate of convenience and necessity effective February 27, 1989; (2) ordered Tri-Compaction to cease and desist from engaging in the solid waste industry effective February 27, 1989; (3) debarred Fiorillo *672 Bros., Tri-Compaction, Anthony Fiorillo, Michael Fiorillo, Joseph Fiorillo, Matthew Ianniello and Benjamin Cohen from the solid waste industry; (4) fined Fiorillo Bros., Tri-Compaction, Anthony Fiorillo, Michael Fiorillo and Joseph Fiorillo $323,000 for waste flow violations pursuant to N.J.S.A. 48:13A-12 and $1,000 for operating Tri-Compaction without a certificate of public convenience and necessity; (5) ordered Fiorillo Bros. to provide the Board with access to all customer billings from June 1987 to March 1988 so that it can calculate penalties for tariff violations; (6) ordered Fiorillo Bros. and Tri-Compaction to provide their customer list to the Board to arrange for alternative service for Fiorillo Bros. and Tri-Compaction customers; (7) directed the Board to convene a collections meeting to provide alternative service for Fiorillo Bros. and Tri-Compaction customers; (8) prohibited Fiorillo Bros., Tri-Compaction, Anthony Fiorillo, Michael Fiorillo and Joseph Fiorillo from arranging for the provision of service to former Fiorillo Bros. or Tri-Compaction customers, and (9) prohibited Fiorillo Bros., Tri-Compaction, Anthony Fiorillo, Michael Fiorillo and Joseph Fiorillo from disposing of or encumbering Fiorillo Bros. or Tri-Compaction property without Board approval.
Briefly, by way of background, on March 24, 1988, the Board issued an order to show cause directed to Fiorillo Bros. and its principals, alleging violations of applicable emergency solid waste flow orders and a collection of excessive fees from its customers in violation of its tariffs. The order sought revocation of the certificate of public convenience and necessity to operate as a solid waste collection utility held by Fiorillo Bros. and debarment of the individuals from the solid waste industry. On March 5, 1988, Fiorillo Bros. and its principals moved to transfer the case to the Office of the Administrative Law. Appellants also moved to dismiss the case because the Board failed to join Tri-Compaction, which they claimed was an indispensable party. Fiorillo Bros. also moved for additional discovery and a stay of all proceedings pending resolution of an action pending in the Federal court, which it had filed attacking *673 the validity of the Board's emergency solid waste flow orders. Except to permit appellants to engage in limited discovery, the Board on May 10, 1988, denied all motions. Thereafter, on May 31, 1988, the Board amended the order to show cause to add Tri-Compaction and its principals as parties to the action and to include as an additional ground for revocation of licensure and for debarment the convictions of its principals, Matthew Ianniello and Benjamin Cohen for federal crimes.
The hearings commenced in May, 1988 and continued through November, 1988. On July 29, 1988, the Board prohibited Fiorillo Bros. and Tri-Compaction from transferring ownership interests to customer accounts during the pendency of the proceedings. Additionally, on September 15, 1988, the Board denied appellants' motions to dismiss the matter as to Tri-Compaction and to consolidate this action with another matter commenced by the Department of Environmental Protection against Fiorillo Bros. At the conclusion of the lengthy hearings, the Board issued a thorough written decision of January 25, 1989, in which it found, among other things, that Fiorillo Bros. and Tri-Compaction were integrated, interrelated enterprises that had violated emergency waste flow orders by directly disposing of New Jersey generated solid waste in out-of-state facilities and that Tri-Compaction was operated without proper permits. The Board also found that Fiorillo Bros. had charged excessive fees in violation of applicable tariffs. The Board therefore imposed the sanctions and penalties that gave rise to this appeal.
We granted appellants leave to appeal and stayed the Board's order pending appeal, thus permitting Fiorillo Bros. to continue operations. However, we expressly barred Ianniello and Cohen from participating in Fiorillo Bros.' enterprises. We also barred the Board from convening a meeting of waste haulers to take over Fiorillo Bros.' customers pending the appeal and we stayed payment of the penalties on the condition that appellants post a supersedeas bond. Finally, we denied appellants' motion to stay the prosecution of this appeal pending final computation *674 by the Board of the tariff penalty. The Board's motion to vacate our stay was denied by the Supreme Court.
Appellants seek a reversal of the final administrative action of the Board, contending generally that the action is not supported by sufficient credible evidence. Specifically, they contend that (1) the Board erred in refusing to transfer the matter to the Office of Administrative Law; (2) the emergency waste flow orders violate (a) the commerce clause of the United States Constitution, (b) the contract clause of the United States and the New Jersey Constitutions, (c) procedural due process, (d) the Sherman Antitrust Act, and (e) New Jersey Public Contract law; (3) the emergency waste flow orders are revenue raising laws and are invalid since they did not originate in the General Assembly; (4) the Board erred in finding that Tri-Compaction was a recycling facility; (5) the penalties imposed by the Board for waste flow violations are contrary to N.J.S.A. 48:4-12b; (6) the Board's finding that Fiorillo Bros. violated its tariff is not supported by sufficient credible evidence on the record; (7) the Board's failure to act on their application to transfer the stock constituted a gross abuse of discretion, and (8) the revocation of their certificates of public convenience and necessity and debarment of the principals from the solid waste industry constituted excessive sanctions.
We are satisfied from our careful study of the voluminous record in light of the arguments presented that the final administrative action of the Board was not arbitrary, capricious or unreasonable, that it was supported by the evidence, and that it did not violate legislative policies expressed or fairly implied in the statutory scheme administered by the Board. See Henry v. Rahway State Prison, 81 N.J. 571, 579-580, 410 A.2d 686 (1980); Campbell v. Department of Service, 39 N.J. 556, 562, 189 A.2d 712 (1963); In re Waste Disposal Agreement, 237 N.J. Super. 516, 526-529, 568 A.2d 547 (App.Div. 1990). See also Public Advocate Dep't v. Public Utilities Bd., 189 N.J. Super. 491, 499, 460 A.2d 1057 (App.Div. 1983); In re Boardwalk Regency Casino License Application, 180 N.J. Super. *675 324, 333-335, 434 A.2d 1111 (App.Div. 1981), mod. 90 N.J. 361, 447 A.2d 1335, app. dism. sub. nom. Perlman v. Attorney General of New Jersey, 459 U.S. 1081, 103 S.Ct. 562, 74 L.Ed.2d 927 (1982). Moreover, all of the issues of law raised are clearly without merit. R. 2:11-3(e)(1)(E). However, further comment is appropriate with respect to some of the contentions.

I.
First, we emphasize that our role in reviewing the Board's findings and conclusions is to determine "`whether the findings made could reasonably have been reached on sufficient credible evidence present in the record', considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility ... and ... with due regard also to the agency's expertise where such expertise is a pertinent factor." Mayflower Sec. v. Bureau of Sec., 64 N.J. 85, 92-93, 312 A.2d 497 (1973) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965)). See also In re Suspension of Heller, 73 N.J. 292, 309, 374 A.2d 1191 (1977); Jackson v. Concord Company Co., 54 N.J. 113, 117-118, 253 A.2d 793 (1969). We are satisfied that such evidence appears in the record.
Furthermore, it is not our function to substitute our independent judgment for that of an administrative agency, such as the Board, where there may exist a difference of opinion concerning the evidential persuasiveness of the relevant proofs. First Sav. & Loan Ass'n v. Howell, 87 N.J. Super. 318, 321-322, 209 A.2d 343 (App.Div. 1965), certif. den., 49 N.J. 368, 230 A.2d 400 (1967). As a reviewing court, we will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein. De Vitis v. New Jersey Racing Comm'n, 202 N.J. Super. 484, 489-490, 495 A.2d 457 (App.Div.), certif. den. 102 N.J. 337, 508 A.2d 213 (1985). See In re Grossman, 127 N.J. Super. 13, 23, *676 316 A.2d 39 (App.Div.), certif. den., 65 N.J. 292, 321 A.2d 253 (1974).

II.
We are satisfied also that there was no impropriety in the proceeding by virtue of the fact that a Deputy Attorney General advised the Board during the hearings while another Deputy Attorney General prosecuted the case before the Board. The law is clear that there is no legal impropriety in a Deputy Attorney General acting as both advisor to and prosecutor for an agency, so long as such representation does not preclude the prosecutor's independent judgment and does not result in actual bias or prejudice or violate due process. In re Polk License Revocation, 90 N.J. 550, 576-577, 449 A.2d 7 (1982); Matter of Cole, 194 N.J. Super. 237, 246-247, 476 A.2d 836 (App.Div. 1984). If one Deputy Attorney General, acting in a dual capacity is acceptable, then it follows that two deputies acting in the separate roles of advisor and prosecutor are beyond reproach. Moreover, there was no evidence that the prosecuting attorney's independent judgment was in any way compromised or that bias, prejudice, or even a due process violation emanated from the dual legal representation in this case.

III.
Appellants claim that the Board's impartiality was undermined by the prosecuting attorney's communicating ex parte with the Board concerning their settlement offer. The Board rejected this argument when raised initially on a motion for reconsideration and we reject it now. The record strongly suggests that appellants' attorney authorized Deputy Attorney General Fisher to communicate the second settlement offer directly to the Board. Deputy Attorney Fisher states that such authorization was expressly given and appellants' attorney admits that comparable authority was given at the initial settlement conference in May, 1988. Consequently, Deputy Attorney *677 General Fisher's communication with the president of the Board was not done ex parte; rather, it was essentially a joint communication by Deputy Attorney General Fisher and appellants' attorney to the Board concerning the possible settlement. In this respect, this matter is clearly distinguishable from Matter of Opinion No. 583, 107 N.J. 230, 240, 526 A.2d 692 (1987).
We are satisfied that the administrative process was not tainted by efforts to settle the case. It is undisputed that the discussions between the prosecuting and counseling Deputies Attorney General were authorized. Appellants' counsel certainly understood that these settlement offers would then be conveyed to the Board because this case could not be settled without the Board's approval. Thus, it is difficult to imagine why any settlement offer would be made unless the offer would reach the Board. The fact that the Board considered and rejected the settlement did not taint the proceedings and render them void.
Moreover, there is no merit to the claim that the president of the Board was biased by virtue of the statement quoted from the Star Ledger that "the [B]oard is handling the Fiorillo Bros. hearing itself because the alleged violations were `pretty blatant.'" There is not even the slightest suggestion of demonstrable bias on this record. Bias and prejudice do not exist merely because the head of an agency states that the agency itself will hear a case with serious allegations. In sum, we are satisfied from our study of this record that appellants received a full and fair hearing before the Board.

IV.
Contrary to defendant's claim, the emergency waste flow orders directing all solid waste to the authorized transfer stations do not violate the commerce clause of the United States Constitution. The commerce clause grants Congress the power "[t]o regulate Commerce ... among the several States...." *678 U.S. Const. art. I, § 8, cl. 3. In the absence, however, of conflicting federal legislation, "`there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.'" Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 669, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580, 586 (1981) (quoting Southern Pacific Co. v. Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945)). It is clear that the interstate trade in garbage is protected by the commerce clause. City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Generally, a state regulation subjected to commerce clause attack will be sustained if it is rationally related to a legitimate state end and if the state interest in enforcing the regulation outweighs the burden imposed on interstate commerce. Borough of Glassboro v. Gloucester County Bd., 100 N.J. 134, 143, 495 A.2d 49, cert. den. 474 U.S. 1008, 106 S.Ct. 532, 88 L.Ed.2d 464 (1985). See also In re Waste Disposal Agreement, supra, 237 N.J. Super. at 530-531, 568 A.2d 547. Commerce clause analysis, of course, requires balancing the national need for the free flow of trade among the various states against the local need of individual states to protect the health, safety and welfare of their citizens.
Modern commerce clause analysis often begins with Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Supreme Court set forth the following test for evaluating whether statutes are in conflict with the commerce clause:
Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. [Id. at 142, 90 S.Ct. at 847, 25 L.Ed.2d at 178 (citation omitted)].
*679 Appellants argue that the burden imposed on interstate commerce is excessive and discriminatory. Before analyzing this case under the Pike standard, it is important to note that the Supreme Court has repeatedly indicated that a legitimate, non-discriminatory exercise of the police power is not barred by the commerce clause because it might indirectly affect interstate commerce. See Head v. New Mexico Bd. of Examiners in Optometry, 374 U.S. 424, 428-429, 83 S.Ct. 1759, 1762-1763, 10 L.Ed.2d 983, 987-988 (1963). The balancing requires "a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664, 675 (1978); Borough of Glassboro v. Gloucester County Bd., supra, 100 N.J. at 142-148, 495 A.2d 49.
The Third Circuit Court of Appeals recently applied the Pike test to a virtually identical challenge to a waste flow regulation on commerce clause grounds. In J. Filiberto Sanitation, Inc. v. Department of Envtl. Protection, 857 F.2d 913 (3d Cir.1988), the Third Circuit rejected a similar challenge based on the commerce clause by a New Jersey solid waste hauler which, like appellants, preferred to haul waste directly out-of-state instead of bringing it to the county transfer station. There, as here, State-promulgated waste flow directives required all county waste to be deposited at a specific transfer station for processing and subsequent disposal out of state.
In finding that directing out-of-state waste through only designated transfer stations posed no impermissible burden on interstate commerce, the Third Circuit recognized the critical importance of waste stream control and direction through New Jersey's comprehensive solid waste scheme established by the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq., and the Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 et seq. The Circuit Court further observed that centralizing out-of-state disposal in county transfer stations had the salutary effect of providing for rational and efficient planning, assuring that *680 waste was disposed of properly, reducing truck traffic, improving data base for planning, allowing the county to enter into long- and short-term contracts for final disposal and providing disposal stability for all haulers.
In our view, the same reasoning can be applied to uphold the identical emergency waste flow orders in the face of appellants' commerce clause attack. The regulatory schemes dealing with New Jersey's garbage crisis when viewed as a whole do not burden interstate commerce and are designed to accomplish the legitimate State interest by efficiently removing garbage from New Jersey streets. In sum, these emergency orders do not offend the commerce clause.

V.
Appellants also contend that the emergency waste flow orders violate the contract clause because they do not have a significant and legitimate purpose and because they substantially impair the contracts which they had previously entered into with various haulers for the disposal of refuge with out-of-state landfill operators. We disagree.
The contract clause of the federal Constitution prohibits a state from passing any "law impairing the obligation of contracts...." U.S. Const., art. I, § 10, cl. 1. The New Jersey Constitution provides a similar, parallel prohibition. N.J. Const. (1947), Art. IV, § 7, par. 3. These two constitutional provisions are construed and applied in the same way to provide the same protection. Fidelity Union Trust Co. v. New Jersey Highway Auth., 85 N.J. 277, 299-300, 426 A.2d 488 (1980), app. dism. 454 U.S. 804, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981); Edgewater Inv. Assocs. v. Borough of Edgewater, 201 N.J. Super. 267, 277, n. 4, 493 A.2d 11 (App.Div. 1985), aff'd 103 N.J. 227, 510 A.2d 1178 (1986). Thus, it follows that if the emergency orders under attack are valid under the federal contract clause, then they are necessarily valid under the parallel State provision.
*681 Although the language of the federal contract clause is absolute on its face, its prohibition against the impairment of contracts must be accommodated to the inherent police power of the states to safeguard the vital interests of their residents. Exxon Corp. v. Eagerton, 462 U.S. 176, 190, 103 S.Ct. 2296, 2305, 76 L.Ed.2d 497, 509-510 (1983); Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569, 580 (1983). The contract clause does not deprive the states of their power to adopt general regulatory measures even if those regulatory measures result in the impairment or destruction of private contracts. Id. at 190, 103 S.Ct. at 2305, 76 L.Ed.2d at 510. The United States Supreme Court has "long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts prior to [the statute's] enactment." Id.
In determining whether a particular state regulatory measure is constitutionally valid under the contract clause, courts apply a three-pronged test. Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra, 459 U.S. at 410-413, 103 S.Ct. at 704-705, 74 L.Ed.2d at 580-581; Lower Main Street Assocs. v. New Jersey Housing & Mortgage Fin. Agency, 219 N.J. Super. 263, 275-276, 530 A.2d 324 (App.Div. 1987), mod. on other grounds 114 N.J. 226, 553 A.2d 798 (1989); Edgewater Inv. Assocs. v. Borough of Edgewater, supra, 201 N.J. Super. at 278, 493 A.2d 11. The first inquiry is whether the challenged regulatory measure has, in fact, caused a substantial impairment of a contractual relationship. If the challenged regulatory measure does impair a contract, then the second inquiry is whether the regulatory measure came into being pursuant to a significant and legitimate public purpose. Once a legitimate public purpose has been established for the challenged regulatory measure, the inquiry shifts to whether the adjustment of the rights and responsibilities of the contracting parties caused by the regulatory measure is based upon reasonable conditions and whether the adjustment is sufficiently *682 related to the appropriate governmental objective or interest. Applying this test to the emergency waste flow orders challenged here, it is entirely clear that they are valid under the contract clause.
First, the contracts which appellants had entered into with haulers to take waste to out-of-state disposal sites were entered into in violation of waste flow directives for the various counties in existence prior to the emergency waste flow orders which directed waste solely to in-state facilities, see N.J.A.C. 7:26-6.5(o)(q) and (u), or in violation of the emergency waste flow orders now challenged. The contracts issued in violation of waste flow orders are void and, thus, appellants cannot show a substantial impairment of an existing legal contractual relationship. Indeed, N.J.S.A. 13:1E-29b, in pertinent part, provides:
No new contract for solid waste collection or solid waste disposal, shall be entered into after the effective date of this act, unless such renewal or such new contract shall conform with the applicable provisions of the approved solid waste management plan of the relevant solid waste management district or unless such contract is approved by the commissioner.
Moreover, even if appellants had proven a substantial impairment of an existing contract, it is evident that "a significant and legitimate" public purpose was served by the emergency waste flow orders. These orders are a part of a comprehensive effort to deal with New Jersey's garbage crisis. They permit the coherent planning for the State's interim, as well as permanent, trash disposal needs and provide for dependable disposal of waste. These orders inhibit illegal dumping which destabilizes the economy of the solid waste facility and creates a health hazard. Additionally, these orders enable the counties to prepare for resource recovery and are a critical component of the State's efforts to insure continued waste disposal. It is uncontroverted that the safe and efficient disposal of the State's waste serves a "significant legitimate" public purpose and the means chosen to implement that purpose are appropriate and reasonable. Consequently, the emergency waste flow orders challenged here pass constitutional muster.

*683 VI.
We are also satisfied that the emergency waste flow orders do not violate Sections One and Two of the Sherman Act. The emergency waste flow orders are exempt from the Sherman Act under the state action exemption. The state action exemption finds its genesis in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) where, in sustaining the right of a State Director of Agriculture and an Advisory Committee to enforce orders adopted pursuant to State law which established marketing practices and prices for raisins grown in California, the United States Supreme Court stated:
[The Order] derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.
The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.
* * * * * * * *
There is no suggestion of a purpose to restrain state action in the Act's legislative history. [Id. at 350-351, 63 S.Ct. at 313, 87 L.Ed. at 326].
In California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court announced the following test for immunity under the Sherman Act:
These decisions establish two standards for antitrust immunity under Parker v. Brown. First, the challenged restraint must be one "clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself. [Id. at 105, 100 S.Ct. at 943, 63 L.Ed.2d at 243 (citations omitted)].
See also Joseph F. Reinfeld, Inc. v. Schieffelin & Co., 94 N.J. 400, 416-418, 466 A.2d 563 (1983); Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325, 336-337, 426 A.2d 1000, app. dism. 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981).
*684 In determining whether a state policy is clearly articulated and affirmatively expressed, it is not necessary to establish that the challenged restraint is a product of legislative compulsion. Rather, it is sufficient to establish that the Legislature merely permitted or authorized the challenged restraint. Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985); Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); Community Communications Co. v. City of Boulder, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). In sustaining a claim of Parker immunity where a state statute was silent as to the challenged restraint (collective ratemaking) by common carriers and where a generalized grant of regulatory authority was conveyed to the state agency, the Southern Motor Carriers Court stated:
A private party acting pursuant to an anticompetitive regulatory program need not "point to a specific detailed legislative authorization" for its challenged conduct. As long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the Midcal test is satisfied. [471 U.S. at 64, 105 S.Ct. at 1730, 85 L.Ed.2d at 49-50 (citations omitted)].
See also Euster v. Eagle Downs Racing Ass'n, 677 F.2d 992 (3d Cir.), cert. den. 459 U.S. 1022, 103 S.Ct. 388, 74 L.Ed.2d 519 (1982). Accord Duke & Co. v. Foerster, 521 F.2d 1277, 1280 (3d Cir.1975).
Finally, where a state's action is found to have been authorized to displace competition as a matter of state policy, the Midcal requirement of active supervision is satisfied. Thus:
Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function. [Town of Hallie v. City of Eau Claire, supra, 471 U.S. at 47, 105 S.Ct. at 1720, 85 L.Ed.2d at 34].
Application of these principles to the New Jersey statutory scheme compels the conclusion that anti-trust immunity exists. In enacting the Solid Waste Management Act N.J.S.A. 13:1E-1 et seq., and the Solid Waste Utility Control Act N.J.S.A. *685 48:13A-1 et seq., the Legislature acknowledged the competitive nature of the industry. However, the Legislature simultaneously recognized the need to regulate the industry, clearly intending to establish a comprehensive regulatory structure. N.J.S.A. 13:1E-2. Pursuant to this policy the Department of Environmental Protection and Board promulgated the Interdistrict and Intradistrict Solid Waste Flow Regulations, N.J.A.C. 7:26-6.1 et seq., the authority to issue each regulation being approved by the New Jersey Supreme Court in A.A. Mastrangelo, Inc. v. Department of Envtl. Protection, 90 N.J. 666, 684, 449 A.2d 516 (1982).
Clearly, both prongs of the Midcal test are satisfied. The Emergency Redirection Orders are part of a clearly articulated and affirmatively expressed policy which regulates all aspects of the solid waste industry, thereby permitting restriction of competition, and these Orders were enacted pursuant to a clearly articulated and detailed regulatory state policy set forth in N.J.S.A. 13:1E-1 et seq., N.J.S.A. 48:13A-1 et seq., and N.J.A.C. 7:26-1.1 et seq. Moreover, the emergency waste flow orders are several of many flow regulations which serve primarily to organize the collection and disposition of New Jersey's waste in a rational, dependable, and efficient manner. Additionally, the regulations discourage illegal dumping by directing waste flows to prescribed disposal sites. They are hardly protectionist devices to fend off competition from hostile Pennsylvania landfills or to maintain an alleged "economic interest" in the solid waste trade. Thus, the emergency waste flow orders do not violate the Sherman Act.

VII.
Turning to the monetary penalties imposed by the Board, we are satisfied that the penalties imposed upon Fiorillo Bros. for the waste flow violations were correctly calculated under N.J.S.A. 48:13A-12b. According to appellants, the $323,000 penalty was incorrectly calculated because it treated each *686 of 323 outgoing truckloads of solid waste as a separate violation, each meriting a separate $1,000 penalty. Instead, appellants maintain that the entire Fiorillo Bros.' operation should have been treated as an "ongoing course of conduct without interruption which can only constitute `one offense,'" against which only a $500 penalty should have been assessed. Again we disagree.
The Board found that Fiorillo Bros. had hauled at least 323 truckloads of solid waste out of state in violation of various emergency waste flow redirection orders. The Board specifically chose not to view the 323 truckloads of trash as part of "one continuous operation". Instead, the Board explicitly elected to treat the separate truckloads as "separate and identifiable acts," each of which carried a separate $1,000 penalty under N.J.S.A. 48:13A-12b.
N.J.S.A. 48:13A-12b, as it existed at the time the Board imposed the disputed penalties, in pertinent part, provided:
Any person who shall violate any provision of this act or any rule, regulation or administrative order promulgated hereunder, or under any applicable provision of Title 48 of the Revised Statutes, or who shall engage in the solid waste collection business or solid waste disposal business without having been issued a certificate of public convenience and necessity, shall be liable to a penalty of not more than $1,000 for a first offense, not more than $5,000 for a second offense and not more than $10,000 for a third and every subsequent offense.
Here, the 323 truckloads of trash do not represent a single continuous violation of the emergency orders, like continuously operating a transfer station without proper authorization over a period of time. Instead, each truckload of trash that went out of state represented a separate violation of the emergency orders. The emergency orders were not being violated during the periods of time between outgoing truckloads. Rather, they were being violated only when the truckloads were sent somewhere other than to the properly designated transfer stations. Therefore, the periods of time between truckloads amounted to "interruptions" between separate violations of the emergency orders. In this respect, this case differs factually from In re Robros Recycling Corp., 226 N.J. Super. 343, 353-356, 544 A.2d *687 411 (App.Div.), certif. den. 113 N.J. 638, 552 A.2d 164 (1988), where the violation  operating a transfer station without proper authority  continued for 62 days without interruption. In light of these discrete "interruptions" between violations, Fiorillo Bros.' dispatch of 323 trucks cannot be viewed as "ongoing conduct without interruption" under the reasoning of the Robros decision. Consequently, the 323 truckloads represent 323 separate violations of the emergency orders, not a single violation.
Therefore, we hold that the Board's assessment of the $323,000 penalty (323 violations times the $1,000 penalty per violation) under N.J.S.A. 48:13A-12b was proper. Cf. In re Suspension of De Marco, 83 N.J. 25, 414 A.2d 1339 (1980).

VIII.
Finally, we are satisfied that the revocation of Fiorillo Bros.' certificate of public convenience and necessity and the debarment of the five principals from future participation in New Jersey's solid waste industry were not excessive. The Board did not act arbitrarily, capriciously or unreasonably in imposing such sanctions in the circumstances of this case.
Under N.J.S.A. 48:13A-9a the Board may revoke the certificate of "any person engaged in the solid waste collection business or the solid waste disposal business upon the finding that such person ... [h]as violated any provision of this act or any rule, regulation or administrative order promulgated hereunder...." The proofs are uncontroverted that Fiorillo Bros. violated the emergency solid waste flow orders and established tariffs. They continued to enter into contracts based on those ongoing violations even after the Board issued the initial order to show cause. Plainly, Fiorillo Bros.' violations were flagrant and widespread and committed with an obvious disregard of the Board's authority and the public interest. Such violations warrant the revocation of Fiorillo Bros.' certificate of public convenience and necessity. See In re Scioscia, 216 N.J. Super. 644, *688 656, 524 A.2d 855 (App.Div.), certif. den. 107 N.J. 652, 527 A.2d 471 (1987).
Moreover, the Board had the authority to bar the principals from participation in New Jersey's solid waste business. See Matter of Scioscia, supra, 216 N.J. Super. at 656-657, 524 A.2d 855. N.J.S.A. 48:13A-6, in relevant part, provides that "[n]o person shall engage, or be permitted to engage, in the business of solid waste collection or solid waste disposal until found by the board to be qualified by experience, training or education to engage in such business, is able to furnish proof of financial responsibility and holds a certificate ... issued by the Board." Here, Joseph, Michael and Anthony Fiorillo plainly participated with and guided Fiorillo Bros. in its flagrant and widespread violations of the emergency orders and tariffs. Thus, the Board properly barred the three Fiorillos from the solid waste industry. Similarly, the Board's debarment of Ianniello and Cohen, based on their federal criminal convictions, was entirely proper.
Accordingly, the final administrative action of the Board is affirmed substantially for the reasons expressed in the Board's thorough written decision and order of January 25, 1989.