645 A.2d 144

IN THE MATTER OF EMERGENCY REDIRECTION
OF SOLID WASTE FROM ATLANTIC COUNTY
TO THE CAPE MAY COUNTY LANDFILL.

IN RE DEPARTMENT OF ENVIRONMENTAL PROTECTION AND
ENERGY EMERGENCY REDIRECTION OF SOLID WASTE
FROM ATLANTIC COUNTY TO CAPE MAY COUNTY.

Superior Court of New Jersey
Appellate Division

Argued May 23, 1994—Decided July 20 1994.

Before Judges COLEMAN, MUIR, Jr., and THOMAS.

*Whitman Breed Abbott & Morgan,* attorneys for appellant Miners Fuel Company, Inc. (*Andrew Muscato* and *David A. Roth,* on the brief).

*Deborah T. Poritz,* Attorney General of New Jersey, attorney for respondent Department of Environmental Protection and Energy (*Andrea Silkowitz,* Assistant Attorney General, of counsel; *Leslie Dannin Rosenthal,* Deputy Attorney General, on the brief).

*Higgins, Slachetka & Long,* attorneys for respondent Cape May County Municipal Utilities Authority (*Mr. Higgins,* on the brief).

*Sandra T. Ayres* argued the cause for appellant Waste Management of Pennsylvania (*Schwartz, Tobia & Stanziale,* attorneys; *Ms. Ayres,* on the brief).

*Leslie Dannin Rosenthal,* Deputy Attorney General, and *Gail M. Lambert,* Deputy Attorney General, argued the cause for respondent Department of Environmental Protection and Energy (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Andrea Silkowitz,* Assistant Attorney General, of counsel; *Ms. Rosenthal,* on the brief).

*Thomas S. Higgins* argued the cause for respondent Cape May County Municipal Utilities Authority (*Higgins, Slachetka & Long,* attorneys; *Mr. Higgins,* on the brief).

*William J. Linton* argued the cause for respondent Atlantic County Utilities Authority (*Mr. Linton,* General Counsel and on the letter brief).

The opinion of the court was delivered by

COLEMAN, P.J.A.D.

The narrow issue we decide in these appeals is whether an order by The Commissioner of the Department of Environmental Protection and Energy (DEPE) redirecting the flow of solid waste from an out-of-state landfill to the Cape May County Municipal Utilities Authority (CMCMUA) Landfill *purely* for economic rea-

sons, was based on an "emergency condition." We hold there was no emergency condition and the order is therefore vacated.

## I

The controlling facts are not disputed. CMCMUA owns a landfill located in Woodbine and Upper Township, New Jersey. The landfill is located within the Pinelands Preservation Area and is subject to the jurisdiction of the Pinelands Commission. *N.J.S.A.* 13:18A–1 *et seq.*, *N.J.A.C.* 7:50–1 *et seq.* The anticipated closure date for the landfill was changed on July 6, 1981, to August 8, 1990. *N.J.A.C.* 7:50–6.75(a). The 1981 extension permitted CMCMUA to use a not yet constructed landfill after August 8, 1990, but from that date only for disposing of its proposed resource recovery operation's residual non-processible waste, and to serve as an emergency backup system for approximately twenty-five years. The landfill became operational in 1984.

In March 1989, CMCMUA applied to the Pinelands Commission to waive the August 8, 1990 closure date. The application was not completed until September 1989. The Pinelands Commission denied the application administratively and CMCMUA sought a contested hearing. The matter was referred to the Office of Administrative Law. An ALJ's Initial Decision dated July 11, 1990, concluded CMCMUA "has failed to satisfy the requirements of *N.J.A.C.* 7:50–4.66(a)21 to establish a compelling public need for a waiver of [its] strict compliance." Out-of-state solid waste disposal was regarded as a feasible alternative.

The Pinelands Commission issued its final decision on July 13, 1990, and amended the ALJ's decision by extending the closure date to December 31, 1992. This extension was granted because the Commission found no available alternative except out-of-state landfills existing outside the Pinelands area prior to December 31, 1992. The Pinelands Commission also permitted CMCMUA to develop Phase 1C of the landfill but gave CMCMUA the discretion

to reduce the size of Phase 1C.[1]

CMCMUA appealed the Pinelands Commission's decision to the Appellate Division and we affirmed in an unpublished opinion dated June 30, 1992. While that appeal was pending, CMCMUA increased its Pinelands landfill capacity by approximately one million tons when it constructed Phase 1C. Just a few months after the expansion, CMCMUA reported on May 4, 1992, that it used 114,160 tons of landfill capacity between April 1991 and March 1992, and that the landfill had an unused capacity of 1,644,897 cubic yards, or approximately 1,110,305 tons of solid waste capacity. *See N.J.A.C.* 7:27-21.1 (cy × 27 ÷ 40 = tons).

CMCMUA also threatened to file a petition for certification with the Supreme Court. Even though adequate documentation prevents us from being certain why it occurred, an order dated July 29, 1992, is captioned in the Supreme Court of New Jersey. This document is called a "Stipulation of Settlement" and it extends the landfill closure date to May 1, 1996.

In March 1993, the landfill had a remaining capacity of approximately 670,000 tons. CMCMUA still utilized approximately 115,000 tons per annum. The DEPE calculated that on May 1, 1996, based on CMCMUA's utilization rate, the landfill will have an unused capacity of approximately 325,000 tons. The Pinelands Commission restricts use of this landfill to Cape May, Ocean, Burlington and Atlantic Counties. *N.J.A.C.* 7:50-6.74. Ocean and Burlington Counties deposit their solid waste in landfills within the State and advised CMCMUA that they had no available solid waste to send to CMCMUA landfill. This left Atlantic County as

---

[1] The landfill was made ready to receive solid waste in three phases. Phases A and B were prepared prior to 1990. Phase 1C was prepared in stages known as Cell 1, Cell 2, Cell 3 and Cell 4. Cell 2 was the first to be constructed and that was during the fall of 1990 and approved by the DEPE in January 1991. Cell 1 was next constructed in 1991 and approved in January 1992. While we are not certain when Cell 3 and Cell 4 were constructed, a report certifying proper construction was submitted in February 1992. Cell 3 and Cell 4 consist of eight acres. All of Phase 1C added 1,000,000 tons of landfill capacity.

the only possible sender to CMCMUA from within the Pinelands Area.

The CMCMUA having exhausted all efforts to obtain a closure date later than May 1, 1996, turned to the DEPE for assistance. It advised the DEPE Commissioner that unless the 325,000 tons of available solid waste disposal capacity is utilized, Cape May County "will have a significant amount of unretired debt ... approximately $15 Million...." The Commissioner was advised further that failure to utilize the anticipated 325,000 tons of solid waste disposal capacity "would constitute an act of financial irresponsibility ($15 million unretired debt = $20.00 per ton additional tipping fee for 20 years)." Finally, on March 17, 1993, CMCMUA sought an emergency order from the DEPE redirecting solid waste flow into the CMCMUA landfill.

The DEPE conducted informational hearings to decide how to cope with CMCMUA's problems. The first such hearing was conducted on July 30, 1993, and it was attended by representatives of CMCMUA, Atlantic County Utility Authority (ACUA), Waste Management of Pennsylvania (WMPA), and the Pinelands Commission. During the next five months, briefs were exchanged and many discussions were conducted. A second informational hearing was conducted on January 4, 1994, and a representative of Miners Fuel Company, Inc. (Miners) was present also because it had entered a hauler's contract with ACUA in June 1993. During these hearings, alternatives to redirecting solid waste from ACUA to the CMCMUA landfill were explored. When other alternatives could not be finalized by January 14, 1994, and the DEPE regarded time to be of the essence, an emergency redirection order was entered by the DEPE on that date to avoid "rate shock" to CMCMUA rate payers.

The emergency order redirected the flow of type 10 solid waste, defined as municipal household, light commercial and institutional waste. *N.J.A.C.* 7:26–2.13(g). The order provided:

For the 27 month period beginning on January 24, 1994 and ending May 1, 1996, a total of approximately 325,000 tons of solid waste type 10 (an average of approxi-

mately 12,000 tons per month or 144,500 tons per year) generated from within Atlantic County and processed at the Atlantic County Transfer Station, facility number 0108M, located at Egg Harbor Township, Atlantic County, will be redirected from out-of-state disposal to the Cape May Landfill, facility number 0511C, located in Woodbine Borough and Upper Township.

The reasons stated for the redirection order were as follows:

Without additional tonnage from outside the district, Cape May County ratepayers will have to pay drastically increased disposal rates in order to amortize the fixed costs of the CMCMUA system over fewer units. This rate shock could not only cause an unanticipated financial burden to Cape May County communities, but also cause real environmental harm as illegal dumping and diversion is proportionally increased by such rate increases. In order to address the need to avoid rate shock and consequential environmental harm from an increased risk of illegal dumping of existing in-state disposal facilities, and to promote the state's policy goal of self-sufficiency, the Department is hereby redirecting, over an approximately two and one-half year period, a total of 325,000 tons of solid waste type 10 generated from within Atlantic County, and processed at the Atlantic County Transfer Station, to the Cape May County Landfill for disposal.

Because any further delay in redirecting this waste could seriously endanger Cape May County's ability to utilize all available capacity, the Department must utilize the provisions of N.J.A.C. 7:26–6.7 for an emergency redirection of solid waste flow in order to immediately provide additional waste flow to the Cape May Landfill.

All of ACUA's type 10 solid waste, only some of which was involved in the redirection order, was processed at the Atlantic County Transfer Station. Prior to the redirection order, all of the type 10 solid waste from ACUA was transported by licensed haulers for disposal in the WMPA landfill in Pennsylvania. The contract between WMPA and the ACUA created an exception if the solid waste is "to be disposed of in any Authority Landfill." Authority Landfill was defined to mean a landfill owned by ACUA or any "landfill or other solid waste facility located within the State to which Acceptable Waste has been validly directed by the NJDEP or the BPU." WMPA has filed an appeal under A–2850–93T3.

Miners is a licensed hauler. It has a contract to haul type 10 solid waste from Atlantic County to the WMPA landfill in Pennsylvania. Miners invested substantial capital and incurred large debt services to obtain the contract with ACUA. The contract defined the collection and transportation to include the following:

The collection of material located at the ACUA Transfer Station site, or at such other site(s) within or outside Atlantic County as may be designated by ACUA hereunder, and its delivery for disposal at the ACUA Transfer Station, ACUA Limited Use Landfill, ACUA Recycling Center, or at one or more Designated Disposal Facilit(ies).

Miners has appealed under A–2849–93T3 from the redirection order which prevents it from transporting and WMPA has appealed because the order prevents it from receiving 12,000 tons of type 10 solid waste from Atlantic County at WMPA's landfill in Pennsylvania for 27 months. Applications for stays of the redirection order have been denied. We now consolidate these appeals for disposition.

## II

WMPA contends, among other things, that the redirection order violates both the Commerce Clause of the United States Constitution and the contract it made with CMCMUA. However, it urges us not to reach the commerce clause issue because no basis existed for the issuance of the emergency redirection order. Miners has not argued a commerce clause violation in its main brief. It argues only that no emergency existed to justify the order. We agree with WMPA that the appeals should be disposed of without reaching the constitutional issue. *See generally C & A Carbone, Inc. v. Town of Clarkson,* 511 *U.S.* ——, 114 *S.Ct.* 1677, 128 *L.Ed.*2d 399, decided May 16, 1994.

Emergency redirection orders are controlled by *N.J.A.C.* 7:26–6.7:

(a) Upon a determination by the Department that an emergency condition, including but not limited to the unanticipated closure of a disposal facility or restricted access thereto, requires the redirection of waste flows, the Department may, after approval by the Board, order such redirection.

(b) The Department shall, within 20 days of such redirection, determine the likely duration of the redirection.

1. If the expected duration is 90 days or less, the Department's redirection shall remain in effect.

2. If the expected duration is greater than 90 days but not more than 180 days, the Department and the Board shall, by public notice, request written comment for

a 30-day period. The Department and the Board may modify such waste flow redirections on the basis of comments received.

3. If the expected duration is greater than 180 days, the Department shall order the affected districts to submit a plan amendment which provides for the modification of existing waste flow.

■ Even though DEPE had the power to issue an emergency redirection order, it could only do so based on sufficient credible evidence in the record establishing an emergency existed. *See Matter of Certain Amendments,* 133 *N.J.* 206, 217, 627 *A.*2d 614 (1993); *Goodman v. London Metals Exch., Inc.,* 86 *N.J.* 19, 28–29, 429 *A.*2d 341 (1981).

*N.J.A.C.* 7:26–6.7(a) requires that an "emergency condition" be established before an emergency redirection order may be issued. The Code does not define "emergency condition," but *N.J.A.C.* 7:26–6.7(a) makes clear that unanticipated closure of a disposal facility is not the only type of emergency condition. Indeed, the 1993 update to the Statewide Solid Waste Management Plan provides that "economic hardship" qualifies as an emergency condition. To the same effect, see *In re New Jersey Bd. of Public Utilities,* 200 *N.J.Super.* 544, 551, 491 *A.*2d 1295 (App.Div.1985).

■ Emergency, by definition, contemplates an unforeseen, sudden or unexpected set of circumstances calling for immediate action. WEBSTER'S NEW COLLEGIATE DICTIONARY 372 (1977); *Carlson v. Hannah,* 6 *N.J.* 202, 214, 78 *A.*2d 83 (1951). This same notion is reflected in our Supreme Court's interpretation of the term "emergency" under our "Disaster Control Act, *N.J.S.A.* App. A:9–30 *et seq. Worthington v. Fauver,* 88 *N.J.* 183, 440 *A.*2d 1128 (1982); *County of Gloucester v. State,* 132 *N.J.* 141, 623 *A.*2d 763 (1993). To the same effect, see *Board of Educ. v. The City of Elizabeth,* 13 *N.J.* 589, 593, 100 *A.*2d 745 (1953), construing the Education Act, Title 18.

■ Words and phrases in a statute and regulation are to be given their generally accepted meaning unless inconsistent with legislative intent or a different meaning is expressly indicated. *Grogan v. DeSapio,* 11 *N.J.* 308, 323, 94 *A.*2d 316 (1953).

Here, the regulations do not define "emergency condition." Only one reported decision involves an emergency redirection order based on economic conditions. *In re New Jersey Bd. of Public Utilities, supra,* 200 *N.J.Super.* at 549–51, 491 *A.2d* 1295, involved an emergency redirection order due to economic hardship to F & S when CMCMUA did not have its landfill operational until April 1, 1984, which was fifteen months behind schedule. That forced the operator of the F & S landfill to delay closure at a time when the anticipated expenses were $245,000. In the interim, the DEPE promulgated new closure regulations, thereby increasing the closure expenses to $1,992,000. An emergency redirection order was issued to permit recovery of those unanticipated expenses.

Contrary to an assertion by CMCMUA, *In re Fiorillo Bros.,* 242 *N.J.Super.* 667, 577 *A.2d* 1316 (App.Div.), *certif. denied,* 122 *N.J.* 363, 585 *A.2d* 371 (1990), and *In re Camden Solid Waste Management Dist.,* 214 *N.J.Super.* 247, 518 *A.2d* 1105 (App.Div.1986), did not involve any discussion of whether economic hardship existed which justified the issuance of emergency redirection orders. But both involved unanticipated conditions which served as the basis for the orders.

## III

■ An emergency condition, in the economic sphere, contemplates sudden and unanticipated expenses of such enormity that immediate relief is required. Such emergency relief is designed to tide over a temporary trouble. Here, the record does not support a conclusion that there were unanticipated, sudden or unexpected expenses associated with closure of CMCMUA's landfill.

CMCMUA knew before 1984 when the landfill became operational that the closure date was August 8, 1990. *N.J.A.C.* 7:50–6.75(a). That date was established July 6, 1981. Its efforts to extend that date were only partially successful. CMCMUA was obviously aware of the anticipated closure expenses when a 1988 referendum in Cape May County resulted in a vote against

building an incinerator which would have entitled CMCMUA to deposit ash residue and by-pass waste from the incinerator in the landfill after August 8, 1990. Both the Pinelands Commission and the ALJ rejected CMCMUA's economic argument in its attempt to extend the August 8, 1990 closure date. That argument was rejected because the evidence did not establish "that the burden to be absorbed is extraordinary, and near the limit where it cannot be reasonably absorbed."

The Pinelands Commission, however, extended the closure date to December 31, 1992, in its July 13, 1990, final decision. This extension was granted to permit Cape May County to build an alternative landfill outside the Pinelands Area. CMCMUA chose not to construct a landfill outside the Pinelands Area. Instead, it filed an appeal to the Appellate Division which affirmed the Pinelands Commission. In addition, while the appeal was pending, CMCMUA constructed approximately 1,000,000 tons of additional landfill capacity at its Pinelands landfill. This was done notwithstanding the Pinelands Commission's permission to develop Phase 1C only to the degree necessary to satisfy CMCMUA's projected landfill needs. It was the construction of landfill capacity over and beyond CMCMUA's projected needs until the December 31, 1992, closure date, which created the anticipated 325,000 tons of unused solid waste disposal capacity involved in the emergency redirection order. The expanded 1,000,000 tons capacity was constructed between 1990 and 1992.

Not only did CMCMUA increase its landfill capacity beyond its projected needs, thereby increasing its financial burden, it ignored the Pinelands Commission's findings accepted by this court in our June 30, 1992 decision that Cape May County could dispose of its solid waste in out-of-state landfills and pay rates similar to what other counties were paying. We also found CMCMUA had failed to negotiate with Essex County to use its incinerator after being informed that capacity was available. The DEPE has made no contrary finding. Consequently, rather than pursuing other reasonable options, CMCMUA expanded its capacity while under

closure order, ignored other alternatives to alleviate its financial burden, and then sought and obtained an emergency redirection order. This conduct can only be characterized as a self-created economic problem which ignored the closure date fixed nearly ten years in advance.

Under the circumstances disclosed by this record, we conclude that no evidence of an emergency was presented. The record only established that CMCMUA has a long term debt service of $45,000,000 from bonds issued over the last decade. Absent facts supporting an emergency, the order dated January 14, 1994, was arbitrary and capricious and is hereby vacated. *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965); *State Dept., of Health v. Tegnazian*, 194 *N.J.Super.* 435, 443–451, 477 *A.*2d 363 (App.Div. 1984).

## IV

After oral argument, the Legislature passed A–480 which enables CMCMUA's landfill to remain open well past the May 1996 closure date. That legislation is awaiting the Governor's signature. If signed, the legislation takes effect immediately. In addition, *Carbone v. Town of Clarkson, supra,* decided seven days before oral argument in the present case, undoubtedly influenced passage of A–480. In view thereof, we direct CMCMUA to submit a new application to the Pinelands Commission for a waiver of strict compliance from *N.J.A.C.* 7:50–6.75(a)5 and *N.J.A.C.* 7:50–6.74(a)(3) for the purpose of extending the May 1, 1996 closure date.

We reject the arguments that the emergency redirection order violated the contract clause because it substantially impairs Miners hauler's contract and WMPA's landfill deposit contract for the reasons stated in *Matter of Fiorillo Brothers of N.J.*, 242 *N.J.Super.* 667, 680–82, 577 *A.*2d 1316 (App.Div.1990), decided prior to *Carbone.* Even though WMPA and Miners contracts seem to recognize valid redirection orders, the validity of those contractual provisions hinges upon an interpretation of *Carbone.* Since we

conclude the record does not support the issuance of the redirection order, we agree with WMPA that the commerce clause issue need not be resolved.

The order dated January 14, 1994, is reversed. The matter is remanded to the Pinelands Commission to permit CMCMUA to seek relief from the May 1, 1996 closure date. We do not retain jurisdiction.