WASTE MANAGEMENT OF PENNSYL-VANIA, INC., and Geological Reclamation Operations and Waste Systems, Inc., Plaintiffs,

v.

Robert C. SHINN, Jr. individually and as Commissioner of State of New Jersey, Department of Environmental Protection and Energy; Jeanne M. Fox, individually; Cape May County Municipal Utilities Authority; George Marinakis, individually and as Executive Director of Cape May County Municipal Utilities Authority; and Richard S. Dovey, Defendants.

Civil Action No. 94–1983.

United States District Court,
D. New Jersey.

Sept. 27, 1996.

C. Clark Hodgson, Jr., (*pro hac*), Robert F. Hecht, Stephen B. Nolan, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Plaintiffs.

Leslie Dannin Rosenthal, Deputy Atty. Gen., James H. Martin, Deputy Atty. Gen., Office of Attorney General, Newark, NJ, for Defendants Shinn and Fox.

Joseph J. Slachetka, Higgins, Slachetka & Long, Laurel Springs, NJ, for Defendants CMCMUA and Marinakis.

Carmen Saginario, Capehart & Scatchard, Trenton, NJ, for Defendants ACUA and Dovey.

## OPINION AND ORDER

RODRIGUEZ, District Judge.

There are three motions presently before this court: (1) plaintiffs Waste Management of Pennsylvania, Inc. and Geological Reclamation Operations and Waste Systems, Inc.'s (collectively, "Plaintiffs") motion pursuant to Fed.R.Civ.P. 56 for partial summary judgment with respect to Count VII of the First Amended Complaint; (2) defendants Robert C. Shinn, Jr. and Jeanne M. Fox's joint motion pursuant to Fed.R.Civ.P. 56(b) for summary judgment and a stay; and (3) Atlantic County Utilities Authority ("ACUA") and Richard S. Dovey's ("Dovey") (collectively, the "Atlantic County Defendants") joint motion pursuant to Fed.R.Civ.P. 56(b) for summary judgment dismissing all counts of the First Amended Complaint as against the ACUA and Dovey. For the reasons expressed below, Plaintiffs' motion for partial summary judgment on Count VII will be granted, Shinn and Fox's joint motion for summary judgment and a stay will be granted in part, denied in part, and dismissed in part as moot, and the Atlantic County Defendants' motion for summary judgment will be denied.

*JURISDICTION*

Subject matter jurisdiction is conferred upon this court by 28 U.S.C. § 1331 as the

Plaintiffs' claims arise under the Constitution and laws of the United States. Plaintiffs also seek to redress the deprivation of rights and privileges secured by the Constitution and the Civil Rights Act of the United States, 28 U.S.C. § 1343(a)(3) and (4). Furthermore, this court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the Plaintiffs are citizens of Pennsylvania and the Defendants are citizens of New Jersey and the amount in controversy is alleged to exceed $50,000.

## BACKGROUND

In 1970, the New Jersey Legislature vested the Department of Environmental Protection ("DEP") with broad authority to regulate solid waste collection, disposal and utilization activity as a utility service under the Solid Waste Management Act, N.J.S.A. 13:1E–1 *et seq.* ("SWMA"), and to regulate the solid waste disposal rates under the Solid Waste Utility Control Act of 1970, N.J.S.A. 48:13A–1 *et seq.* ("SWUCA"). The SWMA designates each New Jersey county and the Hackensack Meadowlands District as a discrete solid waste management district, N.J.S.A. 13:1E–19, and requires that each district develop a comprehensive long-term plan which controls the collection, transportation and disposal of all solid waste generated in the district, including specifying the disposal facilities to be utilized. N.J.S.A. 13:1E–20, –21. The DEP incorporates the terms of each district's plan as waste flow regulations. N.J.A.C. 7:26–6.5. The DEP also established a mechanism for the issuance of emergency waste flow redirection orders. N.J.A.C. 7:26–6.7. An emergency redirection order ("ERO") which has a duration of greater than 180 days must be adopted in accordance with N.J.A.C. 7:26–6.6 as an amendment to the applicable waste flow rule.

The SWMA also requires the DEP to adopt a Statewide Solid Waste Management Plan. N.J.S.A. 13:1E–46. In 1985, the DEP developed and proposed a Solid Waste Management Plan Draft Update 1985–2000 (the "1985 Draft Plan") which set forth New Jersey's waste management goals of source reduction, recycling, and disposal self-sufficiency for the nonrecyclable waste flow.

In April 1990, then-Governor Florio established the Emergency Solid Waste Assessment Task Force whose mandate was to reevaluate the State's waste management policies. In July 1990, the Task Force issued its Report, which analyzed the State's waste stream and identified portions of the waste stream that could be eliminated through source reduction and recycling. Certif. of Leslie Dannin Rosenthal, Exh. D. The Task Force recommended goals of 60% recycling and disposal self-sufficiency for the nonrecyclable waste stream by 1999. Governor Florio accepted the recommendations of the Task Force Report in November 1990.

In June 1991, the DEP issued its Solid Waste Policy Guidelines in Response to Governor Florio's Emergency Solid Waste Assessment Task Force Report (the "1991 Guidelines"). Rosenthal Certif., Exh. E. The 1991 Guidelines stated that "New Jersey remains committed to self-sufficiency and has made significant strides toward this goal." *Id.* at 21. The ·1991 Guidelines also stated that "[t]he DEP will be evaluating the use of out-of-state disposal capacity under existing contractual arrangements on a case-by-case basis and consider authorization of this practice in the context of broader county and regional plans. New proposals for the long-term use of out-of-state capacity will not be approved." *Id.* at 22.

A Statewide Solid Waste Management Plan Update 1993–2002 (the "Statewide Plan") was adopted in January 1994. The Statewide Plan's fundamental objective is to achieve "self-sufficiency in disposal capacity" by eliminating the use of out-of-state disposal facilities by the year 2000. *See* Certif. of Documents/Appendix in Support of Plaintiffs' Motion, Exh. A, Exec.Summ., at 13. The Statewide Plan decrees that (1) new proposals or contracts for the long-term use of out-of-state disposal facilities by New Jersey's counties will not be approved, Statewide Plan at 22; (2) the DEP will continue to foster self-sufficiency through the use of its planning, permitting and financial review processes, Statewide Plan at 22; (3) the DEP will issue emergency waste flow orders to maintain a steady source of solid waste disposal income for in-state disposal facilities,

Statewide Plan at 101; and (4) New Jersey's objective is to achieve waste disposal self-sufficiency by December 31, 1999, Statewide Plan at 160–61, Table 25. The foregoing "objectives, criteria and standards" of the Statewide Plan form the benchmark against which the district plans are reviewed. N.J.S.A. 13:1E–2(b)(6) and 13:1E–24.

Plaintiff Waste Management of Pennsylvania, Inc. ("WMPA") is a Pennsylvania corporation which engages in interstate commerce in solid waste within the state of New Jersey and elsewhere. Plaintiff Geological Reclamation Operations and Waste Systems, Inc. ("GROWS") is a Pennsylvania corporation and an affiliate of WMPA which also engages in interstate commerce in solid waste. Plaintiffs' interstate business services include the disposal of solid waste from New Jersey at landfills located within the Commonwealth of Pennsylvania.

Beginning in 1988, WMPA entered into a series of contracts with New Jersey waste management districts for solid waste disposal at landfills located in Pennsylvania. In February 1988, WMPA entered into a contract with the Mercer County Improvement Authority ("MCIA") for the disposal of 4.5 million tons of Mercer County's solid waste and ash through the year 2016. DEP Commissioner Shinn included within the Solid Waste Facility Permit for the Mercer County incinerator a condition requiring Mercer County to have "in-state non-hazardous residuals disposal capacity available by December 31, 1999, at the latest, consistent with the Department's adopted disposal self-sufficiency objective." See First Amended Complaint, Exhs. D and E, ¶ 15(b) ("Condition 15(b)"). To ensure that self-sufficiency is timely achieved, Commissioner Shinn further required the MCIA to prepare and submit to the DEP "a schedule for the siting, decision, construction and operation of an in-county or other in-state disposal facility for non-hazardous residual materials prior to the initiation of facility operations." Id.

On March 22, 1990, the ACUA published and released a Request for Proposals ("RFP") entitled "Request for Proposal for the Acquisition of an Undivided Interest in Real Property, Consisting of the Acquisition of Certain and Landfill License Rights in One or More Out-of-County Landfills." See ACUA 135. The RFP was issued to allow the ACUA (1) to pursue the acquisition of an undivided interest in real property located outside of the geographic boundaries of Atlantic County, and (2) to enter into a License Agreement which would entitle the ACUA to use purported "air rights" for the disposal of up to 1.6 million tons of solid waste generated within the geographic boundaries of the County. On April 20, 1990, the ACUA received responses to the RFP from WMPA and others, which also included "mark-ups" of the draft License Agreement. On May 15, 1990, the ACUA adopted Resolution No. 90–109, which designated WMPA as the entity with whom the ACUA would negotiate for the purchase of the license. See ACUA 176–78. On May 24 and 30, 1990, representatives of the ACUA and WMPA participated in private negotiation sessions with respect to the terms and conditions of the License Agreement. On May 31, 1990, the ACUA adopted Resolution No. 90–126 which authorized execution of the License Agreement with WMPA. See ACUA 179–81. On June 8, 1990, Atlantic County entered into a license agreement with WMPA for the disposal of 2.0 million tons of Atlantic County's solid waste for a period not to exceed 10 years. See ACUA 197–290.

The License Agreement was reviewed by then-Commissioner Judith Yaskin, who notified the Atlantic County Utilities Authority ("ACUA") by letter dated November 7, 1990 (the "DEP Directive") that one issue required "immediate attention." Rosenthal Certif., Exh. N. Section 6.1(m) of the ACUA–WMPA License Agreement prohibited Atlantic County, unless ordered by DEP and/or BPU, from initiating or pursuing any discussions with another governmental body concerning the processing and disposal of certain waste if the effect might be diversion of waste from the Plaintiffs' landfill to a solid waste facility located in another New Jersey county. Commissioner Yaskin found that Section 6.1(m) was "totally inconsistent with the statewide solid waste management plan and stated self-sufficiency objectives, and the [Emergency Solid Waste] Task Force['s] fi-

nal recommendations." *Id.* at 2. Commissioner Yaskin ordered the ACUA to resume negotiations with other counties. *Id.*

The Cape May County Municipal Utilities Authority ("CMCMUA") independently solicited the ACUA to send its solid waste for disposal at its landfill located in Cape May. By letter dated April 2, 1993, the ACUA advised the CMCMUA that Atlantic County had waste which was capable of being sent to the Cape May landfill but indicated that such waste was committed by contract to WMPA. *See* ACUA 64. The letter also indicated that in November 1990 the DEP had ordered the ACUA to "resume negotiations with other counties toward regionalized solid waste management," and that, although informed of the DEP Directive, WMPA had not taken any action to attempt to reverse or modify its mandate. The ACUA advised the CMCMUA that the ACUA would require "a redirection order from [the DEP] to commence" waste flow to Cape May's landfill. *Id.*

By letter dated July 26, 1993, WMPA advised the ACUA that it objected to the ACUA's attempt to send solid waste to the Cape May landfill, and asserted that the ACUA and WMPA had a binding contract "under which ACUA is obligated to deliver all acceptable waste generated in Atlantic County to the G.R.O.W.S. landfill, in Pennsylvania, until the Mercer County Resource Recovery Facility is operational." *See* ACUA 297.

The CMCMUA sought an emergency redirection order to commence action under the ACUA–CMCMUA interdistrict agreement. Beginning in July 1993 and continuing through September 1993, the DEP held numerous "informational meetings" at which all parties affected by the potential redirection of Atlantic County waste were invited to attend and present testimony. At these meetings the DEP and WMPA worked to identify potential sources of material from other counties which could compensate WMPA for the loss of Atlantic County waste. *See* ACUA 69.

On January 14, 1994 Acting DEP Commissioner Fox issued an Emergency Redirection of Solid Waste Flow And Notice to Solid Waste Haulers ("the January ERO") redirecting the flow of certain waste generated from within Atlantic County to the Cape May landfill. First Amended Complaint, Exh. B. The January ERO was appealed by WMPA and others to the Superior Court of New Jersey, Appellate Division. The Appellate Division, having determined that there was no evidence that an "emergency" existed which would support the issuance of an ERO by the DEP, vacated the January ERO in *Matter of Emergency Redirection of Solid Waste,* 275 N.J.Super. 1, 645 A.2d 144 (App. Div.1994). Pursuant to the Appellate Division's order, the ACUA once again directed its solid waste to WMPA's landfill.

Hudson County disposed of its solid waste at the Hackensack Meadowlands Development Commission ("HMDC") landfill. On September 14, 1993, GROWS contracted with the HMDC to bale and load solid waste and to operate the HMDC landfill. In March 1994, the Essex County incinerator began to accept and receive out-of-state solid waste, particularly from New York City. Shinn issued an emergency redirection order on March 29, 1994 (the "March ERO"), which directed approximately 150,000 tons of waste from Hudson County and 100,000 tons of waste from Passaic County to the Essex incinerator. First Amended Complaint, Exh. C. The effect of the March ERO was the full utilization of all disposal capacity at the Essex incinerator by waste generated in New Jersey and the exclusion of waste generated out-of-state and transported across state lines into New Jersey. The redirection was a critical step towards eliminating out-of-state disposal at the Essex incinerator.

On or about November 22, 1993, the ECUA and WMPA entered into a Memorandum of Understanding which would have provided for the disposal of 2.2 million tons of ash from the Essex County incinerator, starting on July 21, 1994, at the GROWS landfill. The WMPA–ECUA disposal agreement was the subject of the action entitled *Chambers Waste System of New Jersey, Inc., et al. v. Essex County Utilities Authority,* Superior Court of New Jersey, Law Division, Essex County, Docket No. L–1333–94 wherein the Honorable Burrell Ives Humphreys,

A.J.S.C., found that the License Agreement was a contract for services between the ECUA and WMPA and that the ECUA's private negotiation process violated the Local Public Contracts Law, which requires service contracts paid with or out of public funds to be subject to a public bidding process. *See* N.J.S.A. 40A:11–1 *et seq.* The Superior Court set aside the WMPA–ECUA disposal agreement, appointed a fiscal agent to oversee bidding and retained jurisdiction over the matter pending award of the contract under the Local Public Contracts Law. WMPA appealed the order setting aside the agreement to the Appellate Division of the Superior Court.[1]

In accordance with New Jersey's self-sufficiency objective, Mercer County began to develop its plan to include the construction of an incinerator. Atlantic County was to be a partner in the use of that incinerator. In the plan certification issued by the DEP, which approved this regional agreement, the DEP reiterated that "self-sufficiency continues to be the policy of the State of New Jersey." Rosenthal Certif., Exh. O, at 8. Moreover, the DEP ordered the Atlantic and Mercer County landfill contracts amended to include a directive to comply with in-state self-sufficiency by December 31, 1999 and ordered the counties to continue to investigate alternate primary in-county or in-state disposal capacity for ash and bypass waste. *Id.*

Throughout the permitting process for the Mercer County incinerator, the DEP maintained the policy of in-state self-sufficiency and emphasized the need for Mercer County to develop in-state capacity for disposal of the ash residue produced at the incinerator. The May 11, 1993 Notice of Deficiency for the Mercer County incinerator required the MCIA to develop a backup disposal strategy and to "address [the DEP]'s position on the reliance on long-term out-of-state disposal dependency." Rosenthal Certif., Exh. P at 14. Both the draft permit and the final Mercer County incinerator permit included Condition 15(b), which contained the DEP's long-standing requirement that Mercer County have "in-state residuals disposal ca-

pacity available by December 31, 1999, at the latest, consistent with the Department's adopted disposal self-sufficiency objective." First Amended Complaint, Exhs. D and E. WMPA filed an appeal of the permit condition in the Appellate Division of the Superior Court of New Jersey in October 1994, based on state law claims as well as alleged violations of the Commerce and Contract Clauses of the state and federal constitutions. Rosenthal Certif., Exh. Q.[2]

In 1993, WMPA entered into two additional contracts for out-of-state disposal with New Jersey waste management districts. In both instances, the DEP rejected the long-term nature of these contracts as inconsistent with New Jersey's self-sufficiency objective. The DEP has stated that it has rejected every long-term out-of-state disposal contract submitted to the DEP after the adoption of the 1985 Draft Plan. *See* Defendants' Brief in Support of Motion for Partial Summary Judgment and a Stay, at 19; Rosenthal Certif., Exhs. R1, R2 and R3.

In July 1993, the DEP reviewed CMCMUA's proposed contract with WMPA, effective May 1, 1996 for the disposal of up to 1.5 million tons of solid waste for a ten year period. The DEP rejected Cape May County's planned reliance on long-term out-of-state disposal, stating that approval would be "contrary to the goals of the Task Force Final Report and the objectives, criteria, and standards of the January 1993 draft State Solid Waste Management Plan Update: 1993–2003." Rosenthal Certif., Exh. S at 12. The DEP approved the contract on a short-term basis only and directed the CMCMUA to submit a timeline with specific milestones for negotiation of interdistrict agreements with other New Jersey waste management districts. *Id.* at 12–13.

In or about June 1993, Morris County Municipal Utilities Authority ("MCMUA") entered into an agreement with WMPA for the disposal of up to 4.5 million tons of solid waste in WMPA's landfill for a ten year period beginning January 1, 1995. *See* 12(G) Statement, ¶ 14(c). In August 1993, the

---

1. The record does not indicate the disposition of this appeal.

2. The record does not indicate the disposition of this appeal.

DEP reviewed a plan amendment submitted by the MCMUA which set forth a general plan for the development of an in-state disposal system, but which also included as part of its disposal strategy the use of the MCMUA–WMPA contract. Rosenthal Certif., Exh. T at 13. On August 25, 1993, Acting Commissioner Jeanne Fox approved the MCMUA plan amendment, except those provisions related to the planned out-of-state disposal at WMPA's Pennsylvania landfill. Fox stated that "[a]ny reliance on out-of-state landfilling beyond December 31, 1999 is contrary to DEP's goal for achieving in-state self-sufficiency in solid waste disposal by that date." *Id.* The DEP modified the plan amendment to require submission of an in-county or in-state waste disposal system as a condition for consideration of the MCMUA–WMPA contract for certification. *Id.* at 14, 17–18.

The MCMUA–WMPA agreement was submitted for review by the DEP on October 28, 1994. The DEP issued its limited approval of the agreement on December 29, 1994, again limiting its approval to the use of out-of-state disposal to the development of in-state facilities for all of Morris County's waste by December 31, 1999. Rosenthal Certif., Exh. W. In February 1995, WMPA filed a state court appeal of this approval, based on state law claims and alleged violations of the Commerce and Contract Clauses of the state and federal constitution. Rosenthal Certif., Exh. X. On October 11, 1995, the appeal was dismissed by consent of the parties and remanded to the DEP for reconsideration. Rosenthal Certif., Exh. AA.

On November 22, 1994, Morris County submitted a plan amendment to the DEP which sought approval of a Memorandum of Understanding ("MOU") between Morris and Essex Counties for the disposal of up to 225,000 tons of Morris County waste, constituting approximately 70% of its annual waste flow, at the Essex County incinerator. Rosenthal Certif., Exh. U. The MOU recited the fact that both the MCMUA and the ECUA were required to "pursue agreements with other New Jersey Counties for or with respect to the utilization of available excess capacity at in-State solid waste disposal facilities prior to, or in lieu of, utilization of and reliance on out-of-state disposal facilities." See MOU at 2. Commissioner Shinn and the DEP declared that Morris County's plan is "contrary to the [DEP's] disposal self-sufficiency goal." *See* Rosenthal Certif., Exh. W, at 5. Commissioner Shinn and the DEP have notified Morris County "[a]s self-sufficiency is clearly an adopted policy position of the Department, the term for continued out-of-state disposal of municipal waste will in no case exceed December 31, 1999." *Id.* WMPA filed an Order to Show Cause in the New Jersey Superior Court, Law Division, seeking to enjoin the MOU and have the plan amendment declared invalid. Rosenthal Certif., Exh. V. On March 24, 1995, the Law Division heard oral argument on the WMPA Order to Show Cause and rendered a bench decision, followed by a written order on April 22, 1995, which ruled that the terms of the MCMUA–WMPA contract allowed for processible waste to be transported to the Essex County incinerator, but that a *pro rata* share of Morris County ash produced at the Essex County incinerator, as well as all non-processible and bypass waste be transported to and disposed of at the WMPA landfill. Rosenthal Certif., Exh. V at 68; Final Judgment at 2. WMPA filed an appeal of this decision with the New Jersey Superior Court, Appellate Division on June 1, 1995. Rosenthal Certif., Exh. CC.[3]

The matter presently before the court was commenced by WMPA and Geological Reclamation Operations and Waste Systems, Inc. ("GROWS") (collectively referred to as "Plaintiffs") on April 29, 1994, seeking injunctive and declaratory relief and compensatory damages from various New Jersey State and county public entities and current and former State and county officials for alleged violations of Plaintiffs' rights under the Contract and Commerce Clauses of the United States Constitution. On December 22, 1994, Plaintiffs filed a First Amended Complaint which incorporated the allegations contained in the complaint and added an eleventh count. The State Defendants' motions to dismiss the Complaint based on principles of abstention

---

**3.** The record does not indicate the disposition of this appeal.

and immunity from suit were denied by the court on June 22, 1995.

*STANDARD*

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about it might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. The non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.* Moreover, the court must rule "on the record the parties have actually presented, not on one potentially possible." *Madeirense v. Stulman*, 147 F.2d 399 (2d Cir.1945). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

*DISCUSSION*

I. *Plaintiffs' Motion for Partial Summary Judgment*

On December 15, 1995, Plaintiffs' filed a motion pursuant to Fed.R.Civ.P. 56(b) for partial summary judgment on Count VII of the First Amended Complaint which seeks a declaration that New Jersey's "self-sufficiency" objective discriminates against out-of-state disposal businesses in violation of the dormant Commerce Clause of the United States Constitution. Plaintiffs also seek in Count VII a permanent injunction against implementation of waste flow regulations and permit conditions which further New Jersey's self-sufficiency objective.

Before reaching the merits of the Plaintiffs' challenge, the court must determine whether this controversy is justiciable. Defendants assert that there is no longer a case or controversy for this court to decide, as the two EROs at issue herein are no longer in effect and New Jersey's solid waste is being transported to Plaintiffs' landfill under the terms of several license agreements between New Jersey waste management districts and the Plaintiffs. The New Jersey Superior Court, Appellate Division in *Matter of Emergency Redirection of Solid Waste*, 275 N.J.Super 1, 645 A.2d 144 (App.Div.1994), invalidated the January ERO on the grounds that there was no "emergency" warranting its issuance. The March ERO expired on December 31, 1994. As a result, the court must ensure that this case has not been mooted by the fact that the EROs have expired. "An action becomes moot when '(1) there is no reasonable expectation that the alleged events will recur ... and (2) interim relief or events have completely eradicated the effects of the violation.'" *Patriot Party of Allegheny County v. Allegheny County Dept. of Elections*, 95 F.3d 253 (3d Cir.1996) (quoting *Zellous v. Broadhead Assoc.*, 906 F.2d 94, 100 (3d Cir.1990)).

It is apparent that each of the EROs are no longer effective, and in light of the Appellate Division's holding in *Matter of Emergency Redirection of Solid Waste*, 275 N.J.Super. 1, 645 A.2d 144 (App.Div.1994), the court finds that the DEP and its agents would not issue an ERO which redirected solid waste

away from Plaintiffs' Pennsylvania landfill to in-state solid waste disposal facilities. However, to the extent that the EROs constitute applications of New Jersey's self-sufficiency policy, the court finds that the DEP and its agents are likely to perform acts that adversely affect Plaintiffs' ability to perform existing contracts or enter into future long-term contracts for disposal of New Jersey's solid waste. The DEP continues to mandate that all interstate commerce in solid waste come to an end on December 31, 1999.

In furtherance of that mandate, Commissioner Shinn approved Mercer County's agreement with Plaintiffs, subject to Condition 15(b), which requires the county to have "in-state non-hazardous residuals disposal capacity available by December 31, 1999, at the latest, consistent with the Department's adopted disposal self-sufficiency objective." See First Amended Complaint, Exhs. D and E, ¶ 15(b). Condition 15(b) remains an effective part of Mercer County's waste disposal plan.

The State Defendants further assert that the district court's recent decision in *Atlantic Coast Demolition & Recycling v. Board of Chosen Freeholders ("Atlantic Coast II")*, 931 F.Supp. 341 (D.N.J.1996) renders the issue presently before this court moot. However, upon remand from the Third Circuit, the United States District Court in *Atlantic Coast Demolition & Recycling v. Board of Chosen Freeholders* declined to reach the issue of whether New Jersey's self-sufficiency policy passed constitutional muster. 931 F.Supp. 341, 346 n. 3 (D.N.J.1996). Furthermore, it is evident that New Jersey has not completely abandoned the self-sufficiency policy. The State Defendants seek dismissal of Plaintiffs' motion for summary judgment because the self-sufficiency policy "will be

the subject of reformation, unless the plenary appeal of *Atlantic Coast II* by the State is successful." Reply Brief in Opposition to Plaintiffs' Supplemental Brief, at 5.

■ The "capable of repetition, yet evading review" doctrine requires: (1) the challenged action is in duration too short to be fully litigated prior to its cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). Because the self-sufficiency objective is still the controlling policy in New Jersey, this case is capable of repetition, yet evading review. *Patriot Party,* 95 F.3d 253 (3d Cir. 1996) (citing *Norman v. Reed,* 502 U.S. 279, 287–88, 112 S.Ct. 698, 704–05, 116 L.Ed.2d 711 (1992)). It is reasonable to expect the same parties to generate a similar, future controversy subject to identical time constraints. Accordingly, the court holds that this case is justiciable.[4]

The State Defendants further assert that the Eleventh Amendment bars Plaintiffs from obtaining injunctive and declaratory relief sought in Counts I, II, III, and IV of the First Amended Complaint. The State Defendants assert that the relief Plaintiffs seek in Counts I and II is retrospective in nature because the January ERO was invalidated by the Appellate Division's decision in *Matter of Emergency Redirection of Solid Waste* and the solid waste which was being redirected to Cape May under the January ERO is once again being directed to WMPA in accordance with the ACUA–WMPA License Agreement. The State Defendants assert that the relief Plaintiffs seek in Counts III and IV is also

4. On December 14, 1995, the State Defendants filed a motion requesting, *inter alia,* that this court stay its determination of Counts V, VI and VII of the First Amended Complaint until the district court ruled in *Atlantic Coast II.* The State Defendants' motion for a stay is moot and will be dismissed because the district court issued its decision in *Atlantic Coast II* on July 15, 1996. In response to Plaintiffs' supplemental memorandum filed in the present case, the State Defendants assert that the court should await the State's response to the *Atlantic Coast II* decision, as the *Atlantic Coast II* decision mandates a

significant change in New Jersey's waste flow regulations and any such change has the potential of changing New Jersey's self-sufficiency objective. The court's ruling today, however, does not have any effect on *Atlantic Coast II*'s mandate to restructure New Jersey's waste flow regulations, except that in restructuring New Jersey's waste flow regulations the State is prohibited from implementing a self-sufficiency policy which unduly restricts or bars out-of-state waste disposal facilities from doing business in New Jersey on the sole ground that they are located outside New Jersey.

retrospective in nature because the March ERO expired on December 31, 1994 and Hudson County is once again directing solid waste to the HMDC landfill operated by GROWS.

Plaintiffs assert that they do not seek compensation for past conduct, but rather Plaintiffs seek prospective injunctive and declaratory relief to prevent ongoing and future conduct by Commissioner Shinn and the DEP in pursuit of self-sufficiency. Plaintiffs assert that the January and March EROs were issued pursuant to New Jersey's self-sufficiency mandate, which remains in place today as New Jersey's goal for solid waste disposal. Plaintiffs challenge the self-sufficiency policy as a violation of the Commerce and Contract Clauses of the Constitution. Plaintiffs assert that the DEP may issue future EROs in furtherance of its stated self-sufficiency goals.

■ Federal courts may enjoin state officials from committing continuing or future violations of federal law. *Ramirez v. Oklahoma*, 41 F.3d 584, 589 (10th Cir.1994) (Eleventh Amendment does not bar injunctive relief as a remedy for continuing violations of federal law); *G–69 v. Degnan*, 745 F.Supp. 254 (D.N.J.1990) (Eleventh Amendment does not bar entry of a permanent injunction requiring state officials to perform contractual obligations); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (prospective injunctive relief may be ordered against state official). To the extent that Counts I through IV of the First Amended Complaint seek a declaration voiding the January and March EROs and an injunction against implementation of those EROs, the Eleventh Amendment bars such relief. However, the Eleventh Amendment does not bar this court from granting prospective relief in the form of an injunction against implementation of a presently-existing policy by the State if that policy is found to be unconstitutional. Accordingly, Plaintiffs' demand for relief in Counts I through IV will be stricken to the extent that Plaintiffs seek declaratory judgment voiding the January and March EROs and injunctive relief barring their implementation.

The Commerce Clause provides that "[t]he Congress shall have Power ... to regulate Commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. " 'Although the Clause speaks in terms of powers bestowed upon Congress, the Court has long recognized that it also limits the power of the States to erect barriers against interstate trade.' " *Harvey & Harvey, Inc. v. County of Chester*, 68 F.3d 788, 796 (3d Cir.1996), cert. denied, —— U.S. ——, 116 S.Ct. 1265, 134 L.Ed.2d 213 (1996) (quoting *Lewis v. B.T. Investment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980)). State actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 31, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937). State regulations affecting interstate commerce are subject to scrutiny unless such regulations have been preempted or expressly authorized by Congress. *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders*, 48 F.3d 701, 710 (3d Cir.1995). Solid waste and the service of processing and disposing of solid waste are articles of interstate commerce. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, ——, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399, 408 (1994) ("the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it").

New Jersey's self-sufficiency policy is facially discriminatory against out-of-state waste disposal competitors. New Jersey's Statewide Plan expressly provides that (1) new proposals or contracts for the long-term use of out-of-state disposal facilities by New Jersey's counties will not be approved, *id.* at 22; (2) the DEP will continue to foster self-sufficiency through the use of its planning, permitting and financial review processes, *id.* at 22; (3) the DEP will issue emergency waste flow orders to maintain a steady source of solid waste disposal income for in-state disposal facilities, *id.* at 101; and (4) New Jersey's objective is to achieve waste disposal self-sufficiency by December 31, 1999, *id.* at 160–61, Table 25.

In furtherance of New Jersey's stated self-sufficiency mandate, all long-term waste disposal contracts which provide, even in part, for out-of-state waste disposal were rejected to the extent that such out-of-state disposal continued beyond December 31, 1999. For example, the DEP ordered counties that had already entered into long-term out-of-state waste disposal contracts, such as Atlantic County, to resume negotiations with other New Jersey counties. Furthermore, DEP Commissioners ordered the ACUA–WMPA and MCIA–WMPA License Agreements amended to include a directive to comply with in-state self-sufficiency by December 31, 1999 and ordered the counties to continue to investigate alternate primary in-county or in-state disposal capacity for ash and bypass waste.

In July 1993, the DEP reviewed CMCMUA's proposed contract with WMPA for the disposal of up to 1.5 million tons of solid waste by the year 2006. The DEP rejected Cape May County's planned reliance on long-term out-of-state disposal, stating that approval would be "contrary to the goals of the Task Force Final Report and the objectives, criteria, and standards of the January 1993 draft State Solid Waste Management Plan Update: 1993–2003." The DEP approved the contract on a short-term basis only and directed the CMCMUA to submit a timeline with specific milestones for negotiation of interdistrict agreements with other New Jersey solid waste management districts. Rosenthal Certif., Exh. S at 12–13.

When the MCMUA submitted its agreement with WMPA for review, the DEP issued a limited approval of the agreement, again limiting its approval to the use of out-of-state disposal to the development of in-state facilities for all of Morris County's waste by December 31, 1999. Rosenthal Certif., Exh. W.

In addition, in 1993, WMPA entered into two additional contracts for out-of-state disposal with New Jersey waste management districts. In both instances, the DEP rejected the long-term nature of these contracts as inconsistent with New Jersey's self-sufficiency objective. In fact, the State Defendants do not dispute that the DEP has rejected every long-term out-of-state disposal contract submitted for certification after the adoption of the 1985 Draft Plan on the grounds that the ultimate disposal site was located outside New Jersey's borders. *See* Defendants' Brief in Support of Motion for Partial Summary Judgment and a Stay, at 19; Rosenthal Certif., Exhs. R1, R2 and R3.

Furthermore, DEP Commissioner Shinn has included restrictive permit conditions where counties have proposed the development of in-state waste disposal facilities. When Mercer County submitted its proposal to build an incinerator to handle Mercer County's solid waste stream, Commissioner Shinn included within the Solid Waste Facility Permit a condition requiring that Mercer County have "in-state non-hazardous residuals disposal capacity available by December 31, 1999, at the latest, consistent with the Department's adopted disposal self-sufficiency objective." *See* First Amended Complaint, Exhs. D and E, ¶ 15(b) ("Condition 15(b)").

New Jersey's self-sufficiency policy apparently requires solid waste management districts to fully utilize every available in-state disposal option before resorting to out-of-state disposal facilities. When Morris County sought approval of a Memorandum of Understanding ("MOU") between Morris and Essex Counties for the disposal of up to 225,000 tons of Morris County waste, constituting approximately 70% of its annual waste flow, at the Essex County incinerator, the DEP notified Morris County "[a]s self-sufficiency is clearly an adopted policy position of the Department, the term for continued out-of-state disposal of municipal waste will in no case exceed December 31, 1999." *See* Rosenthal Certif., Exh. W, at 5.

The DEP has also issued so-called "emergency redirection orders" to ensure maximum utilization of in-state waste disposal facilities and to support local economic interests. On January 14, 1994, the DEP issued an emergency redirection order which diverted Atlantic County's solid waste from disposal in WMPA's landfill in Pennsylvania to CMCMUA's landfill in Cape May, New Jersey. The ERO was issued "to rectify the unused capacity shortfall that will exist" in

Cape May County's landfill, "to address the need to avoid rate shock," "to maximize the appropriate use of existing in-state disposal facilities," and "to promote the state's policy goal of self-sufficiency." *See* ACUA 72. Similarly, the March ERO stated that the issuance of EROs is "critical toward reducing out-of-state disposal, advancing the Department's primary public policy goal of self-sufficiency, and ... avoid[ance of] economic hardship to County ratepayers." *See* ACUA 76.

Based upon the DEP stated policy objectives and the methods by which the DEP Commissioners have elected to implement those policies for the protection of in-state economic interests, it is evident that self-sufficiency is a call for an end to interstate commerce in New Jersey's solid waste. Accordingly, the court finds that New Jersey's waste disposal self-sufficiency policy is discriminatory on its face and in its effect against out-of-state solid waste disposal providers.

Once a state law is shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls upon the state to demonstrate both that the law serves a legitimate local purpose and that such purpose could not be served by less restrictive means. *C & A Carbone*, 511 U.S. at ——, 114 S.Ct. at 1683; *Atlantic Coast*, 48 F.3d at 717 (citing *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986)); *see also Fulton Corp. v. Faulkner*, —— U.S. ——, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996). Attempts to fit this narrow exception "must be rejected absent the clearest showing that the unobstructed flow of interstate commerce itself is unable to solve the local problem." *C & A Carbone*, 511 U.S. at ——, 114 S.Ct. at 1683.

The State Defendants assert that there exists a genuine issue of material fact as to whether the DEP can meet the burden of proving that no available, nondiscriminatory alternatives are "feasible" and that the public's legitimate concerns could not be served as well by such alternatives. The State Defendants were required by Rule 56 of the Federal Rules of Civil Procedure to come forth with evidence demonstrating the exis-

tence of a legitimate local interest and the non-existence of less restrictive means to serve that interest. The State Defendants have failed to carry this burden.

Rather than coming forth with affirmative evidence demonstrating the existence of legitimate local interests which are served by self-sufficiency as required by Rule 56, the State Defendants urge this court to deny summary judgment and permit the DEP "to demonstrate the potential effect of elimination of the self-sufficiency goal on the legitimate purposes preliminarily identified in deposition testimony." Defendants' Brief in Opp. to Plaintiffs' Motion, at 14. The State Defendants cursorily assert that self-sufficiency serves such goals as "the assurance of long-term disposal capacity, the encouragement of source reduction and recycling, the proper closure of sanitary landfills, and the composition of waste received for incineration." *See* Defendants' Brief in Opposition to Plaintiffs' Motion, at 11. However, the DEP's asserted interests are unsupported by the record and are insufficient to justify an outright ban on export of New Jersey's solid waste after December 31, 1999. WMPA has entered into a series of long-term contracts which have previously been approved by the DEP. The State Defendants have failed to demonstrate that long-term disposal capacity can only exist within New Jersey. Furthermore, source reduction and recycling are not dependent upon whether the disposal facility is located within New Jersey's borders. In fact, as to recyclables, the DEP has stated that "the interstate movement of recyclable commodities must remain unaltered by legislative or regulatory restrictions to maintain the free market system of commerce and to maximize opportunities for the marketing of materials." Statewide Plan at 21. Similarly, the State fails to explain how the State's interest in assuring proper closure of sanitary landfills and incineration must be accomplished by closing its borders to solid waste. The DEP has stated that "the ultimate point of self-sufficiency [is] responsible disposal of New Jersey's solid waste with as little impact as possible on other communities." *See* Defendants' Brief in Opp. to Plaintiffs' Motion for Partial Summary Judg-

ment, at 12. As a factual matter, there is no evidence in the record to support the proposition that New Jersey could not achieve this goal by less restrictive means. We find unpersuasive each interest that the DEP has offered to justify a self-sufficiency policy which prohibits the free flow of New Jersey's solid waste to out-of-state facilities.

In sum, the State Defendants would have this court incorporate into the record of this case the testimony given in *Atlantic Coast* regarding the effect on public finance, health and safety which would occur if New Jersey's solid waste management objectives are overturned. To examine the feasibility of alternatives, the State Defendants assert that the court would require the benefit of evidence presented in *Atlantic Coast II* relating to the public's interests which are served by self-sufficiency and the potential effect of any such alternatives on the ability of the DEP to protect those interests. There can be no wholesale adoption of the record in one case to the record of another. Even if this court were to grant the State Defendants leave to supplement the record, the court notes that, when given an opportunity in *Atlantic Coast II* to demonstrate a legitimate local interest and the existence of no less restrictive means of meeting that interest, the State failed to carry its burden.[5]

The Supreme Court's Commerce Clause opinions have consistently stricken state-sponsored efforts at economic isolation and local protectionist measures. No state may attempt to "isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *Philadelphia v. New Jersey*, 437 U.S. 617, 628, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978). The self-sufficiency mandate of the Statewide Plan creates a barrier to solid waste exports and the use of out-of-state disposal facilities. "The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests." *C & A Carbone*, 511 U.S. at ——, 114 S.Ct. at 1683. The Supreme Court in *Philadelphia v. New Jersey* stated:

> [i]t does not matter that the State has shut the article of Commerce inside the State in one case and outside the State in the other. What is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade.... [W]hatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce from outside the State.

437 U.S. at 626, 628, 98 S.Ct. at 2536, 2537.

The self-sufficiency mandate discriminates against out-of-state waste disposal facilities in favor of in-state economic interests without serving any legitimate local interest which could not be addressed by less restrictive means. "State and local governments may not use their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." *C & A Carbone*, 511 U.S. at ——, 114 S.Ct. at 1684. New Jersey's self-sufficiency policy favors in-state disposal providers and ultimately blocks the flow of solid waste at its borders after December 31, 1999. Accordingly, this court holds that New Jersey's policy of waste disposal self-sufficiency violates the Commerce Clause.

By declaring New Jersey's mandatory self-sufficiency policy unconstitutional, we do not

---

5. The district court in *Atlantic Coast II* stated:

There is clearly a valid local purpose to the flow control regulations. However, the State has not met its burden of demonstrating an absence of feasible nondiscriminatory alternatives. This burden cannot be met by a brief sketch of one potential alternative, followed by its summary rejection. The defendants must compare the flow control regulations with alternative, comprehensive plans. In its submissions to the Court, the State does not even attempt to develop a comprehensive, cohesive plan using the wide variety of political and financial tools available to it. Rather, the de-

fendants have looked at a series of one-dimensional alternatives in isolation and only attempted to prove that no one technique (e.g., system benefit charges, user fees, new taxes, refunding bonds, county or state assumption of debt) can possibly do the job. These isolated distortions do not constitute a fair and adequate attempt at evaluating available alternatives. A simple statement that there are no alternatives to the current system, and that all other plans are at best 'damage control,' will not suffice to meet defendants' burden of proof.
931 F.Supp. 341, 354 (D.N.J.1996).

require the State to eliminate self-sufficiency as a goal. It is entirely reasonable for New Jersey to make planning for the long-term in-state disposal of solid waste a priority. Arguably there are legitimate purposes to be served by developing in-state solutions to complex problems such as waste disposal. Benign purposes, however, do not shield New Jersey's self-sufficiency policy from challenge because "the evil of protectionism can reside in legislative means as well as legislative ends." *Harvey,* 68 F.3d at 797 (quoting *Philadelphia v. New Jersey,* 437 U.S. at 626, 98 S.Ct. at 2536–37). New Jersey's decision to require the development of sufficient in-state waste disposal facilities to handle all waste generated in New Jersey does not appear to violate the provisions of the state or federal constitutions. The DEP retains the authority to set reasonable requirements for the development of in-state solid waste disposal facilities. The court will leave to the legislative process the decision of whether New Jersey's restructured waste management system will retain self-sufficiency as a goal without erecting an absolute bar to out-of-state waste disposal providers. Where, as here, the State absolutely prohibits municipalities from transporting its waste for disposal at out-of-state facilities solely because those facilities are located outside New Jersey, the State runs afoul of the Commerce Clause.

Plaintiffs' motion for partial summary judgment on Count VII of the First Amended Complaint is granted. The forced elimination of the use of out-of-state solid waste disposal facilities by December 31, 1999 as mandated by New Jersey's Statewide Solid Waste Plan Update 1993–2002 is discriminatory in violation of the Commerce Clause. The court will enjoin the New Jersey DEP, Commissioner Shinn, and all other DEP or other public officials from taking any action to restrict or preclude the use of out-of-state

disposal facilities solely because said facilities are located outside New Jersey as mandated under the Statewide Solid Waste Update 1993–2002.

## II. *Shinn and Fox's Joint Motion for Summary Judgment*

On December 14, 1994, defendants Robert C. Shinn ("Shinn"), current Commissioner of the New Jersey Department of Environmental Protection (the "DEP"), and Jeanne M. Fox ("Fox"), former Acting Commissioner of the DEP, (collectively, the "State Defendants") filed a joint motion pursuant to Fed. R.Civ.P. 56(b) for summary judgment dismissing as to Shinn and Fox: (1) all claims seeking compensatory damages; (2) all claims seeking injunctive and declaratory relief in Counts I, II, III, IV and XI; and (3) staying Plaintiffs' request for injunctive relief in Counts V, VI, and VII until the United States District Court for the District of New Jersey issues its opinion in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County ("Atlantic Coast II").* The State Defendants' joint motion seeking summary judgment dismissing all claims seeking compensatory damages is moot by reason of the stipulation of the parties filed on December 15, 1995 [6] and will be dismissed as such. Similarly, insofar as the *Atlantic Coast II* decision was filed on July 15, 1996, the State Defendants' request for a stay of Plaintiffs' request in Counts V, VI, and VII for injunctive relief is moot. Accordingly, the court will consider the balance of the State Defendants' joint motion, which seeks summary judgment dismissing Counts I, II, III, IV and XI of the First Amended Complaint.

### A. *Claim Preclusion as a Bar to Counts I and II*

Defendants [7] seek dismissal of Counts I and II on the grounds that claim preclusion

---

**6.** The Stipulation of Dismissal Without Prejudice (the "Stipulation") apparently contains a typographical error. The Stipulation states that Plaintiffs' claim for compensatory damages in Count IX will be dismissed, but Plaintiffs' demand for damages in Count IX does not seek compensatory damages. It is evident that the parties intended, and the Court will construe, the Stipulation as a dismissal of Plaintiffs' claim for

compensatory damages in Count XI, rather than Count IX.

**7.** The Atlantic County Defendants also assert that Plaintiffs' claims are barred by the doctrine of claim preclusion. See ACUA and Dovey's Brief in Support of Motion for Summary Judgment at 48–52.

bars assertion of this claim. New Jersey's entire controversy doctrine is a claim preclusion rule requiring that a litigant assert all related claims against all parties in one action or be precluded from bringing a second action. *See* N.J.Court R. 4:30A; *Melikian v. Corradetti,* 791 F.2d 274, 279 (3d Cir.1986), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43, *reh'g denied,* 498 U.S. 1017, 111 S.Ct. 594, 112 L.Ed.2d 598 (1990). Accordingly, all claims which arise out of the same common nucleus of operative facts must be resolved in a single action. *Bennun v. Rutgers State Univ.,* 941 F.2d 154, 165 (3d Cir. 1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). The entire controversy doctrine serves three fundamental purposes: "(1) the need for a complete and final disposition through avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *DiTrolio v. Antiles,* 142 N.J. 253, 267, 662 A.2d 494 (1995). Application of the entire controversy doctrine "is discretionary and clarification of the limits of the doctrine is best left to case-by-case determination." *Circle Chevrolet v. Giordano, Halleran & Ciesla,* 142 N.J. 280, 290, 662 A.2d 509 (1995).

Shinn and Fox assert that Plaintiffs' claim could have been determined by the New Jersey Superior Court in *Matter of Emergency Redirection of Solid Waste,* 275 N.J.Super. 1, 645 A.2d 144 (App.Div.1994). We find that Counts I and II state claims pursuant to Section 1983 that could not have been brought within the Appellate Division proceeding in *Matter of Emergency Redirection of Solid Waste.* The Appellate Division proceeding was an appeal by WMPA and an affected hauler, Miners Fuel Company, Inc., for review of the January ERO to determine whether it was arbitrary and capricious. The proceedings were for appellate review and not for affirmative relief. In fact, the Appellate Division had no jurisdiction to hear claims for affirmative relief. *See Stream Encroachment Permit No. 12400,* 231 N.J.Super. 443, 454, 555 A.2d 1123 (App.Div.1989) (Appellate Division review of agency action limited to whether agency's action warrants reversal as arbitrary, capricious or unreasonable).

"Where a federal suit is commenced before a final decision by a state court, ... a state court judgment forecloses a Section 1983 litigant from raising grievances in federal court only if such claims have been pressed before, and decided by, a state tribunal." *Tancrel v. Mayor and Council of the Township of Bloomfield,* 583 F.Supp. 1548, 1550 (1984) (citing *New Jersey Education Assn. v. Burke,* 579 F.2d 764 (3d Cir.), *cert. denied,* 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978)). In the present case, the Appellate Division rendered its decision on July 20, 1994, nearly three months after this litigation was commenced. The Appellate Division in *Matter of Emergency Redirection of Solid Waste* declined to reach the Commerce Clause issue and invalidated the January ERO on state law grounds. 275 N.J.Super. at 8, 12, 645 A.2d 144. Accordingly, the entire controversy doctrine does not bar Plaintiffs from asserting the claims raised in Count I.

The Appellate Division previously determined the Contract Clause claims asserted by Plaintiffs in Count II when it adjudicated the validity of the January ERO in *Matter of Emergency Redirection of Solid Waste.* Thus, we find that Plaintiffs are precluded from asserting that the issuance and execution of the January ERO constituted a violation of the Contract Clause. Even though barred by the doctrine of claim preclusion, WMPA asserts that this court should revisit the Appellate Division's determination in light of the fact that the Third Circuit in *Atlantic Coast* determined that New Jersey's solid waste management system has been administered in a fundamentally discriminatory manner. 48 F.3d 701 (3d Cir.1995). In other words, WMPA asserts that, even if the Plaintiffs' Contract Clause claims are barred by the doctrine of claim preclusion, the court should consider supervening federal interests in interstate commerce and strike down the continued viability of self-sufficiency within the Statewide Plan. *See Bennun,* 941 F.2d at 163 n. 4. We have determined that New Jersey's self-sufficiency policy presents an unconstitutional barrier to interstate com-

merce. Accordingly, we decline to reconsider Plaintiffs' Contract Clause claims, which are barred by the doctrine of claim preclusion.

### B. Eleventh Amendment as a Bar to Plaintiffs' Claims for Injunctive and Declaratory Relief

The State Defendants assert that Plaintiffs are barred by the Eleventh Amendment from obtaining injunctive and declaratory relief sought in Counts I, II, III, IV and XI of the First Amended Complaint. We have already ruled that, to the extent that Counts I through IV of the First Amended Complaint seek a declaration voiding the January and March EROs and an injunction against implementation of those EROs, those claims are barred by the doctrine of claim preclusion and/or the Eleventh Amendment. However, the Eleventh Amendment does not bar this court from granting prospective relief, as we have, in the form of an injunction against implementation of New Jersey's current self-sufficiency policy. We have ordered that Plaintiffs' demand for relief in Counts I through IV be stricken to the extent that Plaintiffs seek declaratory judgment voiding the January and March EROs and injunctive relief barring their implementation.

### C. Abstention

The State Defendants request that this court abstain from adjudicating Plaintiffs' claims. By Order and Opinion dated June 20, 1995, the court denied Defendants' earlier motion for abstention. The court noted therein that "the abstention issue was resolved in the recent Third Circuit Opinion in *Atlantic Coast Demolition & Recycling, Inc. v. Atlantic County, et al.,* 48 F.3d 701 (3d Cir.1995)." *See* Order and Opinion dated June 20, 1995. The State Defendants have asserted no facts to warrant reconsideration. Accordingly, Defendants' request for abstention is denied.

### D. Justiciability of Plaintiffs' Claims

Defendants assert that there no longer exists a case or controversy for this court to determine. For the reasons set forth at length above, we disagree.

### III. ACUA and Dovey's Joint Motion for Summary Judgment

The third motion before the court is a joint motion by the ACUA and its president, Richard S. Dovey, for summary judgment dismissing Counts I, II, VIII, and IX of the First Amended Complaint as against the ACUA and Dovey. Plaintiffs' claims against the Atlantic County Defendants arise out of the issuance by the DEP of the January ERO, which redirected solid waste generated in Atlantic County from disposal in Plaintiffs' Pennsylvania landfill to a landfill located in Cape May County, New Jersey. The Atlantic County Defendants assert that Dovey is immune from suit and not liable to Plaintiffs for civil damages on the basis of qualified immunity, that Plaintiffs' claims for damages against the Atlantic County Defendants under 42 U.S.C. § 1983 are barred for lack of a protectable property right or interest, that Plaintiffs' Contract Clause claim must be dismissed as a matter of law, that Plaintiffs' claims for injunctive relief as to the the January ERO are non-justiciable as the January ERO has expired, that damages suffered by Plaintiffs are speculative, and that Plaintiffs have waived their right to object to the acts alleged in the First Amended Complaint. The court will address each of Defendants' arguments in turn.

### A. Qualified Immunity

The Atlantic County Defendants assert that Dovey is immune from suit because his conduct in performing his duties as president of the ACUA was objectively reasonable in light of the clearly established law and information he possessed at the time he acted. For the reasons that follow, we find that the record is insufficient to support a finding that Dovey is immune from suit.

The United States Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), defined the limits of qualified or "good faith" immunity by enunciating a test that focuses on the legal reasonableness of an official's act. There, the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Further, "qualified immunity shields [officials] ... from suit for damages if 'a reasonable [official] would have believed [his] actions to be lawful, in light of the clearly established law and the information the ... [official] possessed.' " *Hunter v. Bryant,* 502 U.S. 224, 226, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)); *see also Acierno v. Cloutier,* 40 F.3d 597, 606 (3d Cir.1994) (narrowing the threshold inquiry to an examination of whether the constitutional right asserted by the plaintiff was "clearly established at the time the Defendants acted.").

The Third Circuit has recently stated:

> The right an official is alleged to have violated must have been 'clearly established' in a 'particularized' sense. *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. That is, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' *Id.* Thus, qualified immunity does not apply if 'reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be unlawful.' *Good v. Dauphin County Social Services for Children and Youth,* 891 F.2d 1087, 1092 (3d Cir.1989).

*Abdul–Akbar v. Watson,* 4 F.3d 195, 202 (3d Cir.1993).

In *Good v. Dauphin County Social Services,* 891 F.2d 1087 (3d Cir.1989), the Third Circuit held that the "clearly established" standard involves two governing inquiries: (1) whether reasonable officials could have believed, in light of what was in the decided case law, that their conduct would be lawful; and (2) even where they should have been aware of governing legal principles, whether, based on the information available to them, they could have believed their conduct would be consistent with those principles. 891 F.2d at 1092.

In *Acierno,* the Third Circuit held that it need go no further than the first inquiry if it can determine that reasonable officials could have believed that their actions were lawful. 40 F.3d at 620. Thus, the qualified immunity defense has "evolved ... [to] provide[ ] ample protection to all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Thus, to the extent that Dovey acted reasonably under all the circumstances of this case, and, assuming Dovey is eventually shown to have violated the law, to the extent that Dovey did not knowingly commit such violations, Dovey is immune from suit. Like the district court in *Atlantic Coast II,* the court will not award damages against public bodies or officials who reasonably believed that New Jersey's policy and their actions in furtherance of that policy were constitutional or mandated by higher authority. However, WMPA alleges in the First Amended Complaint that the Atlantic County Defendants did not merely follow New Jersey's self-sufficiency policy, but rather that the Atlantic County Defendants acted in Atlantic County's economic self-interest by collaborating to divert fees from WMPA to save $1.5 million in transportation costs in addition to obtaining CMCMUA's promise to dispose of an equivalent volume of solid waste in the future, for an additional $22 million in fees. Plaintiffs further assert that the ACUA and CMCMUA negotiated to divert solid waste from WMPA approximately one and one-half years before the January ERO was issued. Accordingly, it is inappropriate for this court to determine on summary judgment whether Dovey acted reasonably and without committing a knowing violation of the law. *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 538 F.2d 180, 185 (8th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977) ("Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.")

B. *Existence of a Protectable Property Right Under 42 U.S.C. § 1983*

The Atlantic County Defendants assert that WMPA does not have a property right

that may be protected under Section 1983. Specifically, the Atlantic County Defendants assert that the ACUA–WMPA License Agreement is void because the process by which the agreement was entered into violated the Local Public Contracts Law, N.J.S.A. 40A:11–4, which requires certain contracts which are paid with or out of public funds to be bid. The Atlantic County Defendants acknowledge that the ACUA–WMPA License Agreement purports to grant an undivided interest in real property and the use of "air rights" for the disposal of solid waste, however, the Atlantic County Defendants assert that the acquisition of a real property interest and air rights were a pretext created for the purpose of avoiding the bidding requirements of the Local Public Contracts Law. In support of their assertion that the License Agreement is void, the Atlantic County Defendants analogize this case to the case of *Chambers Waste System of New Jersey, Inc., et al. v. Essex County Utilities Authority,* Docket No. L–1333–94, wherein Judge Humphreys of the Superior Court of New Jersey held that, although the license agreement at issue therein provided for the acquisition of an undivided interest in real property, the agreement was, in substance, a service contract required to be bid under the Local Public Contracts Law.

In response, WMPA cites the case of *Empire Sanitation Landfill, Inc. v. Morris County Municipal Utilities Authority,* Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C–1–93, wherein the Honorable Reginald Stanton, A.J.S.C., found that the MCMUA was not subject to the requirements of the public bidding laws with respect to a proposal which granted an easement in real property and denied Empire's emergency application for temporary restraints. *See* Certif. of Documents/Appendix of Plaintiffs' in Opposition to Motion, Exh. 8.

WMPA further asserts promissory estoppel as a defense to the Atlantic County Defendants' assertion that the License Agreement is void. The RFP provides at Section 1.5.1 that the ACUA "is not obligated to establish and follow a particular process in the procurement of the License." *See* ACUA

145. Furthermore, WMPA asserts that it relied upon the opinion letter of ACUA's counsel which stated that the Local Public Contracts Law did not apply. *See* Certif. of Documents/Appendix of Plaintiffs' in Opposition of Motion for Summary Judgment of ACUA and Dovey, Exhibit 1. In addition, Plaintiffs assert that the DEP approved Atlantic County's plan which designates WMPA as Atlantic County's waste disposal site. N.J.A.C. 7:26–6.5(a).

As a preliminary matter, the court finds neither the *Empire* nor the *Chambers* decisions have the authority of precedent. *See* N.J.R.Civ.Pro. 1:36–3 ("no unpublished opinion shall constitute precedent or be binding upon any court."). Neither *Empire* nor *Chambers* has been authorized for publication. In addition, it is significant to note that *Empire* came before the Superior Court on an emergency application and Judge Stanton's decision is specifically restricted to "a tentative basis." Id. at 4. Furthermore, Chambers appealed the Superior Court's decision in *Chambers* and the record is silent as to its ultimate disposition. In any event, *Chambers* is factually distinguishable from the case presently before this court. Unlike here, the ECUA in *Chambers* did not issue a request for proposals.

██ In addition, this court finds that there exists a genuine issue of material fact as to the validity of the ACUA–WMPA License Agreement which prevents entry of summary judgment on this record. It is not readily apparent to this court that the ACUA–WMPA License Agreement was required to be publicly bid, and that, even if bidding was required, the process by which the ACUA–WMPA License Agreement was entered into failed to comport with the applicable statute.

New Jersey's Local Public Contracts Law, N.J.S.A. 40A:11–1 *et seq.,* provides that

> Every contract or agreement for the performance of any work or the furnishing or hiring of any materials or supplies, the cost or the contract price whereof is to be paid with or out of public funds, not included within the terms of [N.J.S.A. 40A:11–3], shall be made or awarded only by the governing body of the contracting unit af-

ter public advertising for bids and bidding therefor. . . .

N.J.S.A. 40A:11–4. The Request for Proposals issued by the ACUA provided at Section 1.1.2:

The RFP, including the appendices thereto, has been distributed to those firms who have requested a copy of same from the Authority pursuant and in accordance with the provisions of a notice which was previously published by the Authority advertising the availability of the RFP.

ACUA 139. It is inappropriate, based on the record before this court, to enter summary judgment as to the validity of the ACUA–WMPA License Agreement.

### C. Viability of the Contract Clause Claim

The Atlantic County Defendants further assert that the prohibition in the Contract Clause against impairment of legitimate contractual obligations is not a redressable right under Section 1983. Historically, § 1983 was intended by Congress to enforce the provisions of the Fourteenth Amendment. *Monroe v. Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 475–76, 5 L.Ed.2d 492, 496 (1961). Accordingly, the scope of § 1983 is coterminus with the rights guaranteed by the Fourteenth Amendment. *Id.*, 365 U.S. at 171, 81 S.Ct. at 475–76, 5 L.Ed.2d at 496; *Poirier v. Hodges*, 445 F.Supp. 838, 842 (M.D.Fla.1978). The Contract Clause has never been incorporated into the sphere of Fourteenth Amendment protections. Accordingly, the Atlantic County Defendants assert that the prohibition in the Contract Clause against impairing legitimate contractual obligations is not a right redressable under 42 U.S.C. § 1983. *Id.* at 842. Although the Contract Clause has not been incorporated into the rights protected by the Fourteenth Amendment, "[t]oday it is beyond dispute that a contract with a state entity can give rise to a property right protected under the Fourteenth Amendment." *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1397 (3d Cir.1991). This court need not reach the issue of whether Plaintiffs may assert their claim for viola-

tion of the Contract Clause because the Court has dismissed Count II as being barred by the doctrine of claim preclusion.

### D. Justiciability of the January Emergency Redirection Order

The Atlantic County Defendants assert that the Plaintiffs' claims in Counts VIII and IX are non-justiciable. Counts VIII and IX allege that the ACUA breached the terms of the ACUA–WMPA contract and the implied covenant of good faith by improperly negotiating with the Cape May County Municipal Utilities Authority, obtaining an emergency redirection order, and diverting solid waste to the Cape May landfill. The ACUA and WMPA have agreed that the sole remedy of WMPA in the event of the ACUA's default under ¶¶ 8.5(a) or (e) of the License Agreement shall be a suit seeking specific performance by the ACUA, as well as appropriate ancillary equitable relief. The ACUA has specifically agreed that an award of damages at law in favor of WMPA would not be an adequate remedy for the ACUA's default under these sections of the License Agreement. In accordance with the terms of the ACUA–WMPA License Agreement, Plaintiffs seek a preliminary and permanent injunction compelling the ACUA to deliver all Acceptable Waste to WMPA. The ACUA is presently directing all Acceptable Waste to WMPA in accordance with the terms of the ACUA–WMPA License Agreement. Thus, the Atlantic County Defendants assert that Counts VIII and IX are moot.

This court finds that the court may still afford Plaintiffs meaningful relief under Counts VIII and IX. At trial, Plaintiffs may be able to demonstrate that the ACUA, acting in concert with others, wrongfully obtained the January ERO and thereby breached the ACUA–WMPA License Agreement and the covenant of good faith. Based upon such a finding, the Court would be able to grant effective injunctive relief to compensate Plaintiffs for the tonnage of waste which was redirected away from the Plaintiffs' landfills.[8] Thus, the court will deny the At-

---

**8.** Plaintiffs suggest that the court consider issuing an injunction which states:

In the event that ACUA does not deliver 2.0 million tons of waste for disposal to Plaintiffs by the December 31, 2001 expiration date,

lantic County Defendants' motion for summary judgment as to Counts VIII and IX of the First Amended Complaint.

### E. *Speculative Nature of Damages*

■ The ACUA–WMPA License Agreement is effective for a period of ten years or two million tons, whichever comes first. The Atlantic County Defendants assert that "any claims for damages based upon the purported diversion of waste from Plaintiffs' landfill is speculative until, at the earliest, the expiration of the 10 year license period or the use by the ACUA of two million tons of capacity." Defendants' Brief at 61. The Atlantic County Defendants suggest that Plaintiffs will not be harmed at all if the ACUA delivers 2.0 million tons of waste to Plaintiffs before the expiration of the License Agreement. This assertion overlooks the potential for decreased tipping fees by the end of the License Agreement which would result in damage to the Plaintiffs despite having received the maximum tonnage under the License Agreement. Plaintiffs' damages are not rendered speculative merely because the exact amount of damage cannot be determined at this time. This court has already determined that effective injunctive relief can be fashioned to compensate Plaintiffs for the loss in tonnage or revenues as determined at trial. *See, supra,* n. 8. Although such relief can properly be deemed conditional, this court is satisfied that injunctive relief is not speculative as to warrant dismissal of Plaintiffs' claims.

### F. *Waiver*

■ The Atlantic County Defendants also assert that the Plaintiffs waived their right to assert the claims Plaintiffs have asserted in this case. The Atlantic County Defendants assert that, by signing the ACUA–WMPA License Agreement, WMPA understood that solid waste could be diverted by the DEP and that the DEP could order the ACUA to

resume negotiations with other New Jersey counties. Under the ACUA–WMPA License Agreement, an exception to the ACUA's obligation to deliver waste to Plaintiffs' landfill is provided for waste which has been "validly directed by the NJDEP and the BPU" to another facility located within the state. *See* License Agreement, § 2.1(c) (ACUA 226) and § 1.1(6) (ACUA 207–08). By its terms, the License Agreement contemplated *valid* redirections. The License Agreement did not contemplate the use of "emergency" redirection orders where no emergency existed. *See Matter of Emergency Redirection of Solid Waste,* 275 N.J.Super. 1, 645 A.2d 144 (App.Div.1994). The License Agreement does not support a waiver of Plaintiffs' right to seek redress for invalid redirection orders.

### *CONCLUSION*

For the foregoing reasons, it is on this 27th day of September, 1996

ORDERED that Plaintiffs' motion for partial summary judgment on Count VII is GRANTED;

ORDERED that the New Jersey Department of Environmental Protection, Commissioner Shinn, and all other DEP or other public officials are permanently enjoined from taking any action to restrict or preclude the use of out-of-state waste disposal facilities solely because said facilities are located outside New Jersey;

ORDERED that Shinn and Fox's motion for a stay with respect to Counts V, VI, and VII is dismissed as moot;

ORDERED that Shinn and Fox's motion for summary judgment is GRANTED IN PART and DENIED IN PART, as noted; and

ORDERED that the ACUA and Dovey's motion for summary judgment is DENIED.

---

ACUA shall bring additional waste to Plaintiffs' landfill and pay Plaintiffs the then commensurate disposal fee, such additional waste amounting to either (1) the difference between the waste delivered by ACUA under the License Agreement and 2.0 million tons; or (2) 64,309 tons whichever is less.

See Plaintiffs' Brief in Opposition to Motion for Summary Judgment of ACUA and Dovey at 25–26. Although it would be inappropriate for this court to enter such an order at this time, the ability to construct effective relief demonstrates that Plaintiffs' claims under Counts VIII and IX are not moot.